The TRAVELERS INDEMNITY
COMPANY, Appellee,

v.

John Gilbert FIELDS, Dorothy Marie
Fields, the Estate of Samuel W. Becker,
Deceased, and Rose Becker, Appellants,
and
Wendy S. Edwards, Appellee.

No. 65206.

Supreme Court of Iowa.

March 17, 1982.

James F. Pickens of Pickens, Barnes & Abernathy, Cedar Rapids, for appellants Fields.

William H. Carmichael and Gregory M. Lederer of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellants Becker.

Terry L. Monson and Richard W. Hoffmann of Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, for appellee Travelers.

Considered by LeGRAND, P. J., and UHLENHOPP, McCORMICK, McGIVERIN, and SCHULTZ, JJ.

UHLENHOPP, Justice.

This appeal involves the question of whether a liability insurance policy on an automobile had expired at the time an accident occurred on December 15, 1977. The case was tried by jury.

Beginning in 1970 John Gilbert Fields (Fields) was an insured under a liability insurance policy issued by The Travelers Indemnity Company on his automobile. His wife, Dorothy Marie Fields, was also an insured under the policy. Condition 1 of the policy stated:

1. *Policy Period*, Territory. This policy applies only to bodily injury, property damage or loss which occurs *during the policy period*:

(1) within the United States of America, its territories or possessions, or Canada, or

(2) within international waters or air space, provided the bodily injury, property damage or loss does not occur in the course of travel or transportation to or from any other country, state or nation.

Unless canceled or terminated, *this policy may be continued in force for successive policy periods*, each of the number of months stated in Item 2 of the declarations, by *payment of the required continuation premium* for each such successive policy period to the company or its duly authorized representative on or before the effective date thereof. The policy period stated in Item 2 of the declarations and each successive policy period shall begin and end at 12:01 A.M., standard time, at the address of the named insured.

(Emphasis added.)

Item 2 of the latest policy declarations preceding the period involving the accident stated:

| Item 2. | *Policy Period:* | | 6 months from | | |
|---|---|---|---|---|---|
| Mo. | Day | Year | Mo. | Day | Year |
| 03 | 23 | 77 | to 09 | 23 | 77 |

(Emphasis added.)

Condition 2 of the policy stated:

2. Premium. The premium stated in the declarations is for *the policy period* stated in Item 2 thereof. If this policy is continued in force for successive policy periods, the premium for each such successive policy period shall be computed in accordance with manuals then in use by the company. If the named insured disposes of, acquires ownership of, or replaces a private passenger or utility automobile or, with respect to Part V, a trailer, any premium adjustment necessary shall be made as of the date of such change in accordance with the manuals then in use by the company. The named insured shall, upon request, furnish reasonable proof of the number of such automobiles or trailers and a description thereof.

(Emphasis added.)

Condition 35 of the policy stated:

35. Policy Continuation. If the company elects not to continue this policy in force for a successive policy period, it shall mail to the insured named in Item 1 of the declarations at the address shown in this policy, written notice of termination not less than twenty days prior to the expiration date of the then current

policy period; provided that, notwithstanding the failure of the company to comply with the foregoing provisions of this paragraph, this policy shall terminate

1. on such expiration date, if

....

(b) the named insured fails to pay the premium as required by the company for the continuation of this policy....

....

Travelers has about a million automobile policies in force. The issuance, billing, and premium payments are handled by computer in the home office in Hartford, Connecticut, and from a low of about 15,000 to a high of about 60,000 premium checks are received per business day. A small computer processes the checks and causes them to be deposited. It transmits the information about the checks to a large computer. That computer recalls and reviews the files in each instance and credits the checks if they are due or issues refund checks if they are not due as in cases of expired policies. Refund checks which are issued are mailed back to the remitters. A Travelers' official testified:

Q. Let's start if you could tell us basically why does a company like Travelers use a computer or computer system to handle their billings and receipt of premiums? A. Well, we use several systems. First of all, largely for the efficiency of operation and the volume of detail and so forth that's involved in servicing virtually any kind of insurance any more it's almost prohibitive to do clerically, to do manually. So we have to rely on systems for their speed, partly and also for their efficiency to get everything done.

Fields' latest policy preceding the period in question ran until September 23, 1977. Pursuant to its programing, Travelers' computer issued Fields a new policy declaration page with a premium notice at the bottom to be torn off and mailed to Travelers with the premium (Exhibit 2). The new declarations page stated *inter alia*, "Item 2. Policy Period 09 23 77 to 03 23 78." The attached premium notice stated, "Policy Period 09 23

77 to 03 23 78" and "Pay Before Due Date 09 23 77 Premium $140.00." This was mailed to Fields from Hartford on August 31, 1977.

Fields was aware of the months his insurance premiums came due. He testified:

Q. And what were the months? A. March and December—I mean September.

Q. And you were aware that premiums were due in those months whether you received a premium notice or not, weren't you? A. I would say yes.

Q. And you knew that your policy was paid every six months, is that correct? A. Yes.

Q. *And it was written for six month periods?* A. *Right.*

....

Q. Going back to the Travelers insurance policy you understood prior to December 15, 1977, you understood that you were paying each six months basically for six months in advance, did you not? A. That's correct.

Q. And you had been insured with Travelers long enough to be familiar with the billing system, is that right? A. Yes. (Emphasis added.) Fields testified with respect to Exhibit 2:

Q. Let's take a look at Exhibit 2, and that's what's called a declarations page, showing your various coverages, is it not? A. Yes, it is.

Q. And if you will take a look at the envelope behind that, that came to you in an envelope postmarked August 31st, is that right? A. That's correct.

Q. And you don't have any reason to think that that was not received by you in the ordinary course of the mails, is that right? A. That's correct.

Q. So that would mean that you would have received that on, let's say sometime during the first week of September, is that right? A. I would agree.

....

Q. And attached to the back of that there is kind of a tear-off portion about this size (indicating), the one that says premium notice? A. Right.

Q. And you understood that to be a bill, did you not? A. Yes.

....

Q. And the information on Exhibit 2 tells you that it's, that payment will provide coverage from September 23, '77 to March 23, '78, does it not? A. Yes, it does.

Q. So if you received that about the first week or so in September, that would have been about two or three weeks before the premium was due, is that right? A. Yes.

Fields did not pay the premium pursuant to Exhibit 2 and testified he found the envelope containing that billing, unopened, in his unpaid bill box after the accident. He also testified he went through his canceled checks as they came back from his bank but he did not find a check for this premium:

Q. You go through the checks to see which ones have come back and which ones haven't? A. Yes.

Q. During the months of September and October and November and December you never did see a check come back made payable to the Travelers, did you, in going through and balancing the check book? A. No, sir.

Q. And that was because none had been written, is that right? A. That's right.

Fields had been late with some previous premiums, but paid within the reinstatement period allowed. He does not rely on that fact in this case; his claim at trial was, instead, that he thought he had paid this premium, as we will subsequently relate.

Travelers has a forty-day grace period after a premium is due. At the expiration of that period and pursuant to its regular procedure, Travelers mailed Fields an "Offer To Reinstate" on November 4, 1977 (Exhibit 3). The offer was dated "11–02–77," and it showed "Successive Policy Period: 09–23–77 to 03–23–78." As to the "Premium Payable" it showed, "Due Date 09–23–77 Effective Date 09–23–77 Premium $140.00." It further stated:

Since we have not received your payment for premium due on or before 09–23–77 your policy expired at 12:01 a.m. on the effective date of the successive policy period shown. If your payment is received within 20 days of the date of this notice, we will be pleased to reinstate your coverage without interruption. A notice of reinstatement will be sent to you when your payment is received. Please contact your Travelers Agent immediately if you have any questions.

Fields testified regarding Exhibit 3:

Q. That notice, as I understand it, was mailed to you on November 4, 1977, it appears from the envelope attached to it? A. Yes.

Q. And you have no reason to think that you didn't receive that in the ordinary course of the mails, do you? A. No, I wouldn't have.

Q. And on the night of the accident you found that in your bill box as it's called, is that right? A. Yes.

....

Q. And on the night of the accident, December 15th, you did find Exhibit 3, that offer to reinstate, and Exhibit 2, which was the original premium bill? You found them both in your bill box, is that right? A. Yes, I did.

Fields also testified that he had received offers to reinstate on previous occasions and had paid them:

Q. Had you received those notices of offers—or these offers to reinstate before the spring of 1977? A. Yes.

Q. And what have you done on each occasion? A. I filled them out and mailed them in.

Fields claimed at trial that on this occasion he did not open the envelope containing Exhibit 3. He did not fill it out or mail it in, or send in a check.

Fields acknowledged as a witness that nothing prevented him from looking through his bill box and discovering the premium notice and the offer to reinstate.

Under its system, Travelers does not withdraw a policy from the computer as

expired at the end of the twenty-day extension for reinstatement—November 22, 1977, in this instance. It waits an additional fifteen days, here until December 7, 1977. The reason for that procedure was explained by a Travelers' witness:

A. This offer to reinstate makes reference to a so-called reinstatement permit. It says that if we receive payment from twenty days from date of this notice we will reinstate the policy and produce a reinstatement notice. So that. twenty day period runs out to this would be November 22nd and again after this notice is put out we hold the file open for another fifteen day interval in here (indicating). This would put us out to December 7th, right here (indicating).

Q. Could you explain for the jury why it is that the extra fifteen day period is in there between the 22nd of November and December 7th? A. Again, it's to allow a generous amount of time or a very adequate amount of time for payments that this notice is intended to prompt, payments that were made anywhere in this twenty day period to be sure that they get through the mailing route that they have to travel into our collection center to be sure they get through that and we have time to process them and give them proper credit for payment.

Q. When you say by the time they get through the mailing route, what is the mailing route that could take fifteen days? A. There is any number. If a payment is mailed on the 20th day and it is put in the U. S. Mail box or post office it's probably going to come in pretty quick, something like three to five days. Some of these payments are made to the agency that is servicing the insurance. He may mail it in, he may wait until he's collected a few more to mail it in, he may route it to our local field office who then has to relay it to the collection office in Hartford. So you can count on anywhere from one to ten days and then we allow us time to have it collected and posted.

Travelers did not receive the premium within the fifteen days. Thus, after expiration of the forty-day grace period, the twenty-day reinstatement period, and the fifteen day waiting period, this policy finally expired on December 7, 1977.

Each year Travelers reviews the status of each policy by a questionnaire sent to the policyholder (Exhibit 4). The Travelers' witness explained the purpose of the questionnaire:

Q. Could you explain for the jury, please, when the renewal questionnaire comes out that we have been discussing, Exhibit 4, I believe it is? A. The renewal questionnaire really has no relationship for the billing and collection of premium. It's put or goes totally separate and virtually unrelated in purpose. On all of our automobile policies, once a year, we do a fairly extensive review of that policy to be sure that it's properly classified as far as the driver that uses the car, the way the car is driven, to and from work, used in business or whatever. In order to accommodate this information we mail out once a year an annual questionnaire which asks these types of questions. That questionnaire is put out a hundred and ten days prior to what we refer to as the anniversary date of the policy. The anniversary date is nothing more than the month in the current year that the policy was originally written in. If we wrote a policy new in March of 1977 then the anniversary month the rest of the time that policy was in force would be March and that's the hub for the once a year processing that we go through. Associated with that renewal questionnaire when it's returned we also in a lot of states obtain records from the state motor vehicle department regarding particularly driving convictions and citations that have been issued for one thing and another and then that information is also included in the renewal review.

The computer was programed to print a questionnaire on this policy on December 5, 1977, and to mail it on December 8, 1977, and the computer did so (Exhibit 4). Fields received the questionnaire between December 10 and 12, 1977. He testified at trial

that on this occasion he did open the envelope from Travelers. The envelope was marked, "IMPORTANT This envelope contains a notice concerning your Automobile Insurance." The questionnaire did not call for payment of premium, but asked a number of questions such as average annual mileage, use of car in business, and traffic convictions. It stated at the top: "IMPORTANT–Please Complete and Return Within 10 Days! Your auto policy will expire soon and we want to give prompt consideration to its continuation. The information requested is necessary to keep your coverage up to date. You can help us by completing this questionnaire and returning it in the enclosed envelope."

The Travelers' witness testified regarding the questionnaire:

Q. One other question was raised regarding the questionnaire and the possibility, this was Exhibit 4, the possibility of stopping a questionnaire that was printed December 5th before it's mailed on December 8th. Is that a very practical procedure to carry out with the volume of business you have, to stop one individual questionnaire in your mail system? A. It can be done, essentially the same thing as looking for one check among thousands.

Q. I assume you are talking about thousands of questionnaires going out at the same time? A. Yes, I forget, four or five or six thousand a day that are mailed.

Although the record contains no evidence that Fields attempted to pay the premium prior to the accident in question, he testified he thought he had done so and relied on the questionnaire as confirming that thought. His direct and cross-examination testimony on reliance, however, were contradictory. On direct he testified:

Q. And isn't it a fact, Mr. Fields, you were operating under the assumption that you had, in fact, made your premium payment that was due September 23, 1977? A. That is correct.

Q. And the Exhibit 4 that you received through the mail from the Travel-ers Indemnity Company confirmed that in your mind? A. It—yes, it did.

Q. And you relied on that document that you, in fact, had valid insurance and had paid the premium? A. Yes.

Q. And it wasn't until after the accident occurred when you looked through your materials you discovered that the payment had not been made? A. That is correct.

On the other hand, on cross-examination he testified:

Q. Between September 23rd and up until the time that you received Exhibit 4, this annual questionnaire, that would be about the 10th or 12th of December, did you think your insurance policy was in force? A. Yes.

Q. So even before you received that Exhibit you thought as far as you knew your policy was paid up and everything was just the way it should be, is that right? A. Yes.

Q. And you thought you had paid the premium, is that right? A. Yes.

Q. So let's say on December 9th, the day before you received Exhibit 4, you weren't have any thoughts going through your mind about, I ought to look through my check book or I ought to look through the bills and make sure I paid my insurance premium, were you? A. No.

Q. As far as you knew it was paid and taken care of, is that right? A. That's correct.

Q. And you weren't on December 9th, I used December 9th, but the let's say the day before you got Exhibit 4, you weren't thinking about going elsewhere to buy new car insurance with somebody else were you? A. No.

Q. If I understand the gist of your testimony, right up until the minute that you received Exhibit 4 in the mail, this annual questionnaire, as far as you knew you had insurance in force with Travelers just like always, is that correct? A. That's right.

Q. You weren't doing anything or thinking anything about checking on whether your car insurance was in force? A. No.

Q. And when you received Exhibit 4, that annual questionnaire, that really didn't do anything to change your mind did it? A. No.

Q. That just didn't make you change your course of action in any way, did it? A. No, sir.

. . . .

Q. I guess to summarize it the best I can, you really didn't change your position in any way on account of receiving Exhibit 4, did you? A. No, sir.

Q. You just went on just the way you would have if that had never come in the mail? A. Yes.

. . . .

Q. In fact, you had thought all along that you had paid your insurance premiums, is that right? A. Yes, I did.

Q. And you didn't have any plans to go back through your checkbook or to do anything else to look to see if you had paid your insurance policy did you? A. No, I didn't.

Q. So receiving Exhibit 4 didn't come as—keep you from doing something that you would have otherwise have done either did it? A. No, it did not.

At about 10:00 p.m. on December 15, 1977, Mrs. Fields, driving the automobile in question, struck and killed Samuel W. Becker and injured Rose Becker. In addition, Wendy S. Edwards ran into the rear of the Fields' car. (Edwards is a party to this case but did not appeal.)

Mrs. Fields notified Fields of the accident. Before midnight that same night, Fields went through his unpaid bills, tore the premium notice off the bottom part of the declarations page (Exhibit 1), and mailed it to Travelers with his check for $140.

The next day Fields reported the accident to the local Travelers agency and his mailing of the check to Travelers. The agency called Travelers' Des Moines office asking if the check could be intercepted and returned. The Des Moines office called the home office, which responded that locating the check was virtually impossible. Travelers' witness testified:

Q. And when a check comes in, Mr. Wimmer, is there any way to, on an individual automobile policy such as Mr. and Mrs. Fields, is there any practical way to catch one check before it's cashed by the system? A. It's extremely difficult to do that just because of the sheer volume of checks coming in. In fact, we haven't found a practical way to do it, so far.

Q. Has it been effective when you have tried to do it? A. No, it's relatively ineffective. There is just too much paper to look through.

Q. Is it fair to say it's almost useless to try? A. It is.

The small computer received the check, processed it, and caused it to be deposited. The large computer then recalled and examined the file, ascertained that the policy had expired, and issued a refund check which was mailed to Fields with a voucher that the policy was cancelled (Exhibit 6A). Travelers' witness testified:

A. Well, the master file, the billing file, is updated nightly by the main system, the one that does the billing and accounting, the payments that were processed for that date are input to the accounting, to the billing system. The system then locates the master file for that particular policy and analyzes it to see what the status of the file is, is it still an in force file, is a dead file, is the premium outstanding or not outstanding and depending on what it finds or what the circumstances are, the system then disposes of the payment that came in. If there is an open item it credits it and if there is something to be returned, meaning something was paid more than outstanding, then the system puts out a check to be printed, in fact, it puts out its own check and that gets released through the mail back to the policy holder.

Q. Is that what happened in this case? A. Essentially, yes. When the payment came in and was processed into the main system the master file was located. The program when it went in and analyzed the file determined that the policy was no

longer in force. It was lapsed, closed and no outstanding premiums.

Q. Nothing new [due?] because there was no insurance? A. And there was nothing due from a prior period so the next step was to put out an extract to print out the check to return the payment.

Q. And that was done and is that check Exhibit 6A? A. Yes, this is the check it had put out.

Q. That's the refund check so to speak? A. Yes, that's right.

Q. And that came out what, a day or so after The Travelers cashed Mr. and Mrs. Fields check? A. That's right, this check is dated December 22, '77.

Travelers brought the present action asking for a declaration that its policy had expired at the time of the accident. The Fields asked the district court to transfer the action to law and to grant a jury trial, which the court did. At trial, the court submitted the case to the jury for findings on nine special verdicts. The jury found in Travelers' favor on all verdicts—that Travelers did not make any false representations to the Fields or conceal any material facts, that Fields did not lack knowledge that he had not paid the premium, that Fields had means of knowledge that he had not paid the premium, that Fields did not exercise reasonable care to discover that he had not paid the premium, that Travelers did not intend Fields to rely on the representation in the questionnaire that the policy would expire soon, that Fields did not rely on the representation, that Fields' reliance on Exhibit 4 did not result in prejudice to him, that Travelers did not intentionally or voluntarily relinquish its known right to require Fields to pay the premium prior to the accident, and that Travelers did not accept Fields' check intending the check to constitute payment and to keep the policy in force.

The trial court entered judgment declaring that the policy had expired prior to the accident. The Fields and Beckers appealed.

In this court the Fields and Beckers, whom we will refer to collectively as the Fields, make three contentions: (1) The policy remained in force for the reason that Travelers did not comply with section 515.-80 and chapter 515D, The Code 1977; (2) As a matter of law, Travelers waived its right to consider the policy lapsed; and (3) The trial court erred in its estoppel instructions.

I. *Statutory termination.* Two statutes are involved in the Fields' first contention.

A. Section 515.80, in the chapter of the Code on insurance other than life, provides:

No policy or contract of insurance provided for in this chapter shall be forfeited or suspended for nonpayment of any premium, assessment, or installment provided for in the policy, or in any note or contract for the payment thereof, unless within thirty days prior to, or on or after the maturity thereof, the company shall serve notice in writing upon the insured that such premium, assessment, or installment is due or to become due, stating the amount, and the amount necessary to pay the customary short rates, up to the time fixed in the notice when the insurance will be suspended, forfeited, or canceled, which shall not be less than thirty days after service of such notice, which may be made in person, or by mailing in a certified mail letter addressed to the insured at his post office or given in or upon the policy, and no suspension, forfeiture, or cancellation shall take effect until the time thus fixed and except as herein provided, anything in the policy, application, or a separate agreement to the contrary notwithstanding.

Travelers did not comply with that section.

█ If a policy has *expired*, section 515.-80 does not apply. The pertinent decisions interpreting section 515.80 are *Hoefler v. Farm & City Insurance Co.*, 193 N.W.2d 538 (Iowa 1972) (policy expired); *Hensley v. Aetna Casualty & Surety Co.*, 200 N.W.2d 552 (Iowa 1972) (same); and *Gibson v. Milwaukee Mutual Insurance Co.*, 265 N.W.2d 742 (Iowa 1978) (policy had not expired—not for a definite period).

In *Hoefler* the policy stated:

Policy period 12:01 Standard Time each date from 2–22–67 to 5–22–67.

"The term of this policy shall be as of 12:01 A.M. Standard Time as to each of the dates given hereon, *and for such terms thereafter as the required renewal premium is paid by the insured on or before the expiration of the current term and accepted by a duly authorized representative of the company.*" (Emphasis added.)

193 N.W.2d at 539 (emphasis added in *Hoefler* opinion). This court stated:

The sole question for our determination is the meaning of the italicized portion of the policy. The parties agree the issue is simply this: Was the policy issued by defendant to plaintiff for a definite period or an indefinite one?

*Id.* The last previous period in *Hoefler* expired on February 22, 1968. The insured did not pay another premium, and the accident occurred in June 1969. This court held that the policy was for a definite period, that section 515.80 of the Code did not apply, and that the policy had expired prior to the accident.

In *Hensley* the policy declarations stated:

"Policy Period—Quarter-annual period commencing 7–09–63 and, subject to the consent of Aetna Casualty, for successive quarter-annual policy periods as provided in Condition 1."

Condition 1 stated:

"Subject to the consent of Aetna Casualty, this policy may be continued in force for successive policy periods by payment of the required continuation premium to Aetna Casualty on or before the effective date of each successive policy period. If such premium is not paid, when due, the policy shall terminate as of that date and such date shall be the end of the policy. * * * *"

200 N.W.2d at 553, 554. The insured paid no premium after the premium for the quarter-annual period commencing July 9, 1963.

The record also revealed as stated in the dissenting opinion:

Trial court's findings, approved by majority's opinion, included the fact that after Aetna instituted a new computer

billing in 1965, Hensley received no more premium notices. The court also found the Hensleys were methodical people who paid in cash when billed.

200 N.W.2d at 556 (Reynoldson, J., dissenting). Notwithstanding, this court held that *Hoefler* controlled and that the policy had expired at the time the accident occurred on October 16, 1966.

In *Gibson*, where the insured denied receiving premium notices, this court stated that "where a policy is for a set term, it lapses at the expiration of the term even though the insurer might consent to additional periods upon payment of further premiums." 265 N.W. at 744. We held, however, that the policy was not for a set term; it continued indefinitely with premiums payable periodically and with cancellation permitted the insurer upon nonpayment of premiums. The only words in the policy referring to its duration were:

1. Policy Period, Territory. This policy applies only to accidents, occurrences and loss during the policy period while the automobile is within the United States of America, its territories or possessions, or Canada, or is being transported between ports thereof.

Each premium notice in *Gibson* stated a period for the particular premium but did not state a policy period. In addition, we held that the premium notices did not constitute a part of the policy itself. We also considered that a policy clause allowing cancellation for nonpayment of premiums supported the conclusion that the policy was a continuing one rather than for a specific period. We do not stop to consider the point that in *Gibson* the insured denied receiving the premium notices whereas here he admitted receiving the notice but claims he did not open it.

The facts of this case bring it under *Hoefler* and *Hensley* rather than *Gibson*. Condition 1 of the present policy states that the policy applies to loss which occurs during the policy period and may be continued in force for successive policy periods of the number of months stated in Item 2 of the

declarations. Item 2 of the policy declarations expressly states the policy period. Exhibit 1, the policy declarations, states:

Item 2. *Policy Period.* 6 months from

| Mo. | Day | Year | | Mo. | Day | Year |
|-----|-----|------|-----|-----|-----|------|
| 03 | 23 | 77 | to | 09 | 23 | 77 |

(Emphasis added.)

In addition, paragraph 35 of the policy conditions states that the policy shall terminate on its expiration date if the insured "fails to pay the premium as required by the company for the continuation of this policy . . . ."

The policy contains a cancellation clause, condition 33. This clause, however, does not contradict the policy provisions regarding the policy period. The cancellation clause gives each party the right to terminate the policy while it is in force, and establishes the method of ascertaining the pro rata premium for the remaining portion of the policy period. If cancellation is by the insured, he specifies the cancellation date in the written notice he mails to the insurer. If cancellation is by the insurer, it must give a twenty-day written notice, except that a ten-day notice is permitted if the insured is in default under a premium finance plan or extension of credit or the policy has been in effect less than sixty days. Condition 34 further limits the insurer's right to cancel the policy after it has been in effect sixty days.

Paragraph 1 of Condition 1 relating to the policy period is consistent with the cancellation clause. It allows the insured to continue the policy for successive policy periods by payment of premium unless the policy has been "cancelled or terminated." Whether the cancellation clause in condition 33 is effective in view of section 515.80, we have no occasion to inquire; neither party attempted to use it.

Examination of the appellate records in the *Hoefler, Hensley* and *Gibson* cases reveals that the policies in all three contained cancellation clauses, and that the clauses were similar to the one in the present case.

The trial court correctly held that section 515.80 does not apply.

B. The Fields also rely on the provisions of chapter 515D of the Code.

Chapter 515D constitutes an endeavor by the General Assembly to give holders of automobile policies some protection against cancellation or nonrenewal of policies on prohibited grounds. *See* § 515D.4 (enumeration of permitted grounds for cancellation), § 515D.6 (prohibited grounds for nonrenewal). It also provides for notice of cancellation, § 515D.5, and of nonrenewal, § 515D.7, with right of hearing in each situation upon demand by the insured.

■ By its own terms, however, chapter 515D does not apply to the facts of this case. We have here a policy nonrenewal. Hence sections 515D.4 ("Notice of cancellation—reasons") and companion section 515D.5 ("Delivering of notice"), both dealing with cancellation, do not apply, any more than section 515.80 applies. Indeed, section 515D.4 expressly states, "This section shall not apply to the nonrenewal of a policy."

The sections dealing with nonrenewal are 515D.6 and 515D.7. Section 515D.6, however, does not apply here; it prohibits nonrenewal because of "age, residence, sex, race, color, creed, or occupation," and prohibits a physical examination for renewal in certain cases. None of these factors are involved in this case. Section 515D.7 does not apply because paragraph 2 of the last paragraph of the section provides:

This section shall not apply:

. . . .

2. If the insured fails to pay any premium due or any advance premium required by the insurer for renewal.

Chapter 515D, distinguishing cancellation from nonrenewal of policies, and excepting nonpayment of premium in the nonrenewal situation, confirms the doctrine of the *Hoefler* and *Hensley* cases.

The trial court correctly held that chapter 515D does not apply to the present case.

■ II. *Waiver as a matter of law.* The Fields are compelled to assert waiver as a matter of law, as distinguished from

waiver as a matter of fact, because the trial court submitted the issue to the jury and the jury found against them. The Fields moved for a directed verdict against Travelers on the issue, but the trial court overruled the motion. We view the evidence in the light most favorable to the party opposing the motion. *Osterfoss v. Illinois Central R. R.*, 215 N.W.2d 233, 238 (Iowa 1974) ("the evidence is appraised in the light most favorable to the one against whom the motion is made").

After the accident, Fields sent the premium notice and his check to Travelers. Travelers knew the check was coming, because the next day Fields informed the local Travelers agency he had mailed the check, the agency informed Travelers' Des Moines office, and that office informed the home office.

The problem, however, was that no practical way existed for Travelers to intercept the check. Some 15,000 to 60,000 premium checks pour into the home office each workday. In addition, Travelers could not know which day the check would arrive. Travelers does not maintain the crew of clerical workers necessary to process the remittances manually. Instead, checks are handled automatically by a small computer, which then transmits the information to a large computer. The large computer is programmed so that if it finds certain remittances should not be accepted because of expirations or other reasons, it automatically prints refund checks which are mailed to the remitters. The jury could find that this is what happened here.

■ "Waiver" is usually defined as the voluntary or intentional relinquishment of a known right. *Bishop v. Keystone Area Education Agency*, 275 N.W.2d 744, 753 (Iowa 1979) ("Waiver is the intentional relinquishment of a known right."); *Hegtvedt v. Prybil*, 223 N.W.2d 186, 188 (Iowa 1974) ("Waiver is the voluntary relinquishment of a known right."); 43 Am.Jur.2d *Insurance* § 1053, at 976 (1969) ("a voluntary and intentional relinquishment of a known and existing right"); 45 C.J.S. *Insurance* § 673, at 612–13 (1946) ("the voluntary or inten-

tional abandonment or relinquishment of a known right"). As stated in 92 C.J.S. *Waiver* 1054–55 (1955):

*Voluntary character.* It is generally recognized that a waiver concedes a right, but assumes a voluntary and understanding relinquishment of it, and it is an essential element of a waiver that there exist an opportunity for choice between a relinquishment and an enforcement of the right in question, so that voluntary choice is the very essence of a waiver. A waiver is a voluntary act or the voluntary refraining from action; and the validity of a waiver requires that it shall have been made voluntarily, and that the intent to relinquish be voluntary. It cannot be held that there has been a waiver of valuable rights where the circumstances show that what was done was involuntary, and action is in no sense voluntary which a party cannot decline to take except at the peril of liberty or property; and what one does in a dilemma forced upon him by the default of the other party cannot be counted upon as a waiver. However, the voluntary character of an act relied on to show waiver must not be confused with the reasons prompting such act; a person's actions may be due to cogent reasons and yet be entirely voluntary. A waiver which is obtained or procured by fraud or duress is, of course, ineffective.

*See also* 28 Am.Jur.2d *Estoppel and Waiver* § 158, at 842 (1966) ("Waiver is mainly, or essentially, a matter of intention. Thus a prerequisite ingredient of the waiver of a right or privilege consists of an intention to relinquish it. Indeed, the essence of a waiver, as indicated by its definition, is the voluntary and *intentional* relinquishment of a known right, claim, or privilege."). Where evidence appears tending to establish a question as to the voluntary and intentional character of the relinquishment of a right, the waiver question is one of fact. *Duncan v. Great Western Accident Insurance Co.*, 192 Iowa 716, 719, 185 N.W. 459, 460 (1921).

From the Fields' standpoint the present record—the evidence of Travelers' witness who explained how checks and refunds are processed electronically with no practical way of interception—at best presents a question of fact for the jury on whether Travelers "voluntarily" or "intentionally" relinquished its right to assert the expiration of the policy. The Fields' cited cases are distinguishable on the facts. Their closest case is *State Farm Mutual Insurance Co. v. Bockhorst*, 453 F.2d 533 (10th Cir. 1977). That case, however, contains a critical distinguishing fact. In the present case Fields mailed the premium notice and check directly to the home office. The next day Fields told the local Travelers agency he had sent the check to Travelers, and the local agency and the Des Moines office attempted to intercept the check but the home office was unable to do so. In *Bockhorst*, however, the insured mailed the check to State Farm's agent, Dame. The agent knew of the accident, had the check in his hands, and had the opportunity to intercept it, but instead he sent it to State Farm where a computer processed it and reinstated the policy retrospectively. The case involved the intervention of a human agency, State Farm's own agent, between the insured and the computer, which made interception possible. The court held that State Farm was bound by the knowledge of its agent. *Id.* at 536 ("The computerized reinstatement of the policy was not unavoidable as State Farm alleges. It is conceded that Bockhorst's premium payment would never have been placed in the computer if agent Dame had included information concerning the accident when he mailed the payment to the company."). In view of the fact that the insurer's own agent could have intercepted the check, the court also stated:

> Holding a company responsible for the actions of its computer does not exhibit a distaste for modern business practices as State Farm asserts. A computer operates only in accordance with the information and directions supplied by its human programmers. If the computer does not think like a man, it is man's fault. The reinstatement of Bockhorst's policy was the direct result *of the errors and oversights of State Farm's human agents and employees.*

*Id.* at 536–37 (emphasis added). A case holding the other way where no intervening agent was involved is *McMillon v. Old Republic Life Insurance Co.,* 33 Ill.App.3d 658, 342 N.E.2d 246 (1976) (special Illinois statute, but court held insurer did not "accept" payment where machine automatically deposited check but promptly issued refund).

The trial court did not err in submitting the waiver issue to the jury.

III. *Estoppel.* Finally, the Fields contend that the trial court erred in the jury instructions on their plea of estoppel based on Travelers' statements in the questionnaire. Specifically, they assert that the court should have stated that the estoppel element of knowledge was satisfied if Travelers "should have known" that Fields would rely on those statements. The court did not include the quoted words in its instructions.

We find no necessity to decide this point regarding the knowledge element. Estoppel requires, among other elements, *reliance* on a representation or other conduct to the person's *prejudice.* In their requested instruction, the Fields' enumeration of the elements of estoppel included the following: "(d) Reliance on such false statement or concealment by the party to whom made, resulting in his prejudice." The trial court included this element in its instruction 9. *See also Dierking v. Bellas Hess Superstore, Inc.,* 258 N.W.2d 312, 315 (Iowa 1977) ("D. Reliance on such fraudulent statement or concealment by the party to whom made resulting in his prejudice."); 43 Am.Jur.2d *Insurance* § 1053, at 977 (1969); 45 C.J.S. *Insurance* § 673, at 613 (1946) ("the essential elements of estoppel include ... an innocent and deleterious change of position in reliance on such representations or conduct"). In its special verdicts the jury found no reliance and no prejudice.

The Fields do not claim that a jury question was not presented on the issues of

reliance and prejudice, and on the record they could not successfully do so. Their contentions in the trial court placed them on the horns of a dilemma. On the one hand they asserted that Travelers did not meet the notice requirements of section 515.80 and chapter 515D, and this assertion would be undermined if Fields actually knew the contents of the premium notice and offer to reinstate. (We need not say whether it was undermined by Fields' admission that he received those two letters but did not read them.) Fields had to acknowledge, of course, that he did receive the premium notice, since he returned it to Travelers with his check after the accident, but he testified that he did not open those two envelopes and thought he had paid the premium. On the other hand, Fields' testimony that he thought he had paid the premium also placed him in the position of testifying, not once but several times, that he did not rely on the questionnaire and did not do anything or refrain from doing anything on account of it (although he also testified the opposite). Fields' testimony alone generated a jury issue on reliance and prejudice, to say nothing of the circumstantial evidence.

Since the jury found no reliance and no prejudice, the Fields failed to establish that element of estoppel, quite apart from the question of whether Travelers "should have known" Fields would rely on the statements in the questionnaire.

We thus uphold the judgment.

AFFIRMED.