# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48457

UNITED HERITAGE PROPERTY AND
CASUALTY CO.,

    Plaintiff-Counterdefendant-
    Respondent,

v.

TERRILL W. ZECH and GAYLA D. ZECH,

    Defendants-Counterclaimants-
    Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, January 2022 Term

Opinion filed: August 31, 2022

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Lincoln County. Ned C. Williamson, District Judge.

The judgment of the district court is <u>affirmed.</u>

Wright Brothers Law Office, PLLC, Twin Falls, for Appellants. Andrew Wright argued.

Gjording Fouser, PLLC, Boise, and Elam & Burke, P.A., Boise, for Respondent. Trudy Fouser argued.

---

BRODY, Justice.

This case involves an insurance coverage dispute for fire damage to a rental home. After receiving reminder notices by mail, the insureds failed to pay the renewal premium by the due date. Fourteen days after payment was due, the insureds mailed a check to the insurance company for the late renewal premium. Six days later, but before the insurance company reviewed the late payment, a fire occurred at the rental home. Two days after the fire, the insurance company returned the late payment, denied coverage for the loss, and denied reinstatement of the policy.

The insurance company subsequently brought a declaratory judgment action against the insureds. The district court granted summary judgment in favor of the insurance company. We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background.

In the twelve years leading up to this dispute, Terrill and Gayla Zech (the "Zechs") purchased home or rental insurance policies for their various properties from United Heritage Property and Casualty Company ("United Heritage"). When this dispute arose, the Zechs had thirteen active insurance policies with United Heritage. Relevant to this case is the Zechs' rental home located at 213 West C Street, Shoshone, Idaho (the "Rental"). The Rental was insured through United Heritage for roughly twelve years under an insurance policy (the "Policy") that covered losses due to fire. The Policy was effective for one-year periods and could be successively renewed on July 2 of each year. For successive renewal to occur, the Policy required United Heritage to offer renewal, and the Zechs to accept through timely payment of the renewal premium. The Policy contains no provisions providing for automatic renewal or reinstatement.

The Zechs were routinely late in making renewal premium payments on their various insurance policies with United Heritage, including the Policy at issue in this case. Between 2007 and 2018, "a total of seven lapsed policies were reinstated for the Zechs following Statements of No Loss." The record does not contain the facts surrounding every lapse and reinstatement. The earliest evidence in the record is from 2016 and shows United Heritage accepted the Zechs' late renewal premium payment for the Policy. Two years later, in 2018, the Zechs again missed the Policy's renewal premium due date. This renewal was for an effective period from July 2, 2018, to July 2, 2019. Nine days after the due date, on July 11, 2018, United Heritage mailed the Zechs a "Notice of Cancellation" letter stating the Policy was terminated for "non-payment of premium" with a backdated termination date of July 4, 2018. This notice contained no language that the Policy expired under its own terms on July 2, 2018, when the Zechs failed to pay the renewal premium. United Heritage later explained that its "Notice of Cancellation" letters are a function of its "automated billing system" generated when its employees perform a transaction in the system that payment "was not received, that the policy terminated, and no further bills or reminders should be generated."

2

Six days after mailing the notice, on July 17, 2018, a United Heritage policy diary noted receiving late renewal premiums from the Zechs to "reinstate" three policies, including the Policy at issue. That day, United Heritage sent the Zechs a Statement of No Loss form to sign and return. The form pertained to all three policies, and included language requiring the Zechs to certify no loss, accident, or circumstance that might give rise to a claim occurred between the renewal due date (July 2, 2018) and the date the renewal payments were received (July 16, 2018):

I CERTIFY THAT I AM NOT AWARE OF ANY LOSSES, ACCIDENTS OR CIRCUMSTANCES THAT MIGHT GIVE RISE TO A CLAIM UNDER THE INSURANCE POLICY WHOSE NUMBER IS SHOWN ABOVE, FROM 12:01 AM ON ___07/02/2018___ TO ___07/16/2018___ .

CANCELLATION DATE                    DATE AND TIME SIGNED

X _Dayla D. Zech_

APPLICANT'S SIGNATURE

United Heritage did not dispute that it prepopulated the form as only requiring the Zechs to certify no loss through the date it received the premiums and *not* through the "date and time signed" as stated on the form. After receiving the form and charging a fifteen-dollar reinstatement fee, United Heritage reinstated the three policies while backdating coverage so there was no lapse.

The next year, in 2019, the Zechs again missed the renewal premium due date for the Policy and two other policies. In May of 2019, the Zechs received a declarations page (the "Declarations Page") from United Heritage stating that the Policy "Declaration Type" was "Renewal" and that it would be effective for a new policy period of July 2, 2019, through July 2, 2020. The Declarations Page also stated that "COVERAGE WILL EXPIRE AT 12:01 A.M ON DUE/EFFECTIVE DATE IF NOT PAID."

Also in May 2019, United Heritage also mailed the Zechs a bill for the Policy's renewal premium (the "Bill"). The Bill stated the renewal premium was due on July 2, 2019, and that the "Policy Period" had an "Effective" date of July 2, 2019, through to the "Expiration" date of July 2, 2020. It also stated that "COVERAGE WILL TERMINATE AT 12:01 A.M. ON DUE DATE IF NOT PAID." Roughly one month later, in June of 2019, United Heritage sent the Zechs a reminder notice (the "Reminder Notice") to pay the renewal premium by its due date. The Reminder Notice is substantially similar to the Bill and also states that "COVERAGE WILL

3

TERMINATE AT 12:01 A.M. ON DUE DATE IF NOT PAID." The Zechs do not dispute receiving the Declarations Page, the Bill, or the Reminder Notice.

The Zechs did not pay the renewal premium by the July 2, 2019, due date. Eight days later, on July 10, 2019, United Heritage sent the Zechs a "Notice of Cancellation" letter regarding the Policy. The letter stated the reason for "[c]ancellation" was "Non-Payment of Premium." It also backdated the termination date to the renewal due date, July 2, 2019. The notice contains no language indicating that the Zechs failed to accept an offer of renewal from United Heritage, or that the policy expired under its own terms when the policy period ended on July 2, 2019. Around the same time, United Heritage also sent similar letters for two other policies because the Zechs failed to pay the renewal premiums by their respective due dates. On July 16, 2019, six days after United Heritage mailed the Notice of Cancellation letter regarding the Policy, the Zechs mailed a check for the renewal payments for four different policies, including the Policy at issue (the "Payment").

United Heritage received the Payment on July 18, 2019, and transmitted it to their underwriting department for review. United Heritage's underwriting department reviews payments and correspondence it receives in the order in which they are received. The department did not review the Payment on the day it was received (Thursday, July 18, 2019) or the next day (Friday, July 19, 2019), and the department was not open that weekend (Saturday, July 20, 2019, or Sunday, July 21, 2019).

Four days after United Heritage received the Payment, on Monday, July 22, 2019, a fire damaged the Rental. That same day, after the fire, Mrs. Zech called United Heritage's claims department and left a voicemail generally inquiring about reinstatement. The next day, Tuesday, July 23, 2019, one of United Heritage's underwriters received the voicemail from Mrs. Zech. The voicemail did not state which policies Mrs. Zech wanted reinstated or that a fire had occurred at the Rental. Apart from the Notice of Cancellation letter, United Heritage had made no other contact with the Zechs up to this point concerning renewal, reinstatement, or the late renewal Payment. After listening to the voicemail, the underwriter called the Zechs' insurance agent who informed the underwriter about the fire at the Rental. After the phone call, the underwriter located the late renewal Payment in United Heritage's underwriting system.

One day later, on July 24, 2019, United Heritage returned the entire Payment in a letter concerning the Policy and three other policies. The letter stated the Payment was "being

4

returned" because the Policy, as well as the other three policies, had been "cancelled for non-payment of premium" when the Zechs failed to make the renewal payments. The letter goes on to explain that reinstatement is available for the three other policies, with signed Statements of No Loss, payment of the renewal premiums, and additional reinstatement fees. The letter then stated that reinstatement was not available for the Policy because "a signed Statement of No Loss will not be able to be provided."

Attached to the letter, United Heritage provided prepopulated Statement of No Loss forms for two of the other policies—but not the Policy at issue here. The forms, like before, required the Zechs to certify no loss occurred between the respective renewal premium due date and the date United Heritage received the late renewal Payment—July 18, 2019:



As shown by the "X" marks and prepopulated dates, United Heritage apparently only needed the Zechs to sign and return the forms. The Zechs were not required to certify no loss through the date they actually signed the forms.

The Zechs signed and returned the two forms and paid the renewal premiums plus reinstatement fees. Thereafter, United Heritage reinstated both policies and backdated coverage to each respective renewal due date without a lapse in coverage. However, United Heritage refused to reinstate the Policy. The Zechs soon filed a complaint with the Idaho Department of Insurance (the "Department") asking for reinstatement of the Policy. Prior to and during the complaint process, United Heritage took the position that the Policy was *cancelled* due to non-payment of premium—not that it expired under its own terms. For example, in an email four days after the fire, United Heritage's director of underwriting stated that there was no coverage

for the fire loss because the Policy had been cancelled:

> The initial billing notice for the premium due on July 2 was sent to the insureds on May 9, followed by a reminder notice sent on June 18. Both notices included the disclaimer "COVERAGE WILL TERMINATE AT 12:01 A.M. ON DUE DATE IF NOT PAID." Sufficient prior notice of the cancellation was given in accordance with both the policy and Idaho [Code] [section] 41-2401(1)(j).

The director went on to quote the "Cancellation" notice provision in the Policy that requires, for policies "in effect," at least ten days' notice of "cancellation" for nonpayment of premium before the termination takes effect.

Roughly one week later, a regulatory compliance analyst for United Heritage explained in a letter to the Department that no coverage existed for the fire because the Policy had already been "cancelled[.]" The letter further explained that United Heritage was not willing to reinstate the Policy because of the fire loss that occurred after the Policy "terminated." A few weeks later, the same analyst reiterated that the Payment "was late and that the [P]olicy had cancelled." The analyst again explained that the Policy "was ineligible for reinstatement." The Department eventually concluded in a letter to the Zechs that "[i]t appears [United Heritage] has satisfactorily explained the matter[]" and that "[its] review d[id] not indicate any violations of the Idaho Insurance Code or clear violations of [the Zechs'] insurance contract provisions."

### B. Procedural Background.

After receiving the Department's letter, in November of 2019, the Zechs' attorney submitted a proof of loss letter to United Heritage demanding payment for the fire loss under the Policy. In January of 2020, United Heritage responded by filing a complaint seeking a declaratory judgment that "no policy of insurance was in effect which provides coverage for any loss or damage" to the Rental after the Policy's renewal premium due date, July 2, 2019. Within their answer, the Zechs asserted the affirmative defenses of waiver and equitable estoppel. In the same pleading, the Zechs then counterclaimed for breach of contract and bad faith against United Heritage. Four months into litigation, the parties filed cross-motions for summary judgment. The district court granted United Heritage's motion. The Zechs timely filed a notice of appeal.

### II. STANDARD OF REVIEW

"This Court exercises de novo review of a grant of summary judgment and the 'standard of review is the same as the standard used by the trial court in ruling on the motion for summary judgment.' " *AED, Inc. v. KDC Invest., LLC*, 155 Idaho 159, 163, 307 P.3d 176, 180 (2013)

6

(quoting *Stonebrook Const., LLC v. Chase Home Fin., LLC*, 152 Idaho 927, 929, 277 P.3d 374, 376 (2012)). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Summerfield v. St. Luke's McCall, Ltd.*, 169 Idaho 221, 494 P.3d 769, 776 (2021) (quoting I.R.C.P. 56(a)). "The moving party carries the burden of proving the absence of a genuine issue of material fact." *Banner Life Ins. Co. v. Mark Wallace Dixson Irrevocable Tr.*, 147 Idaho 117, 123, 206 P.3d 481, 487 (2009). "All disputed facts are to be construed liberally in favor of the nonmoving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the nonmoving party." *Foster v. Traul*, 145 Idaho 24, 28, 175 P.3d 186, 190 (2007). "This Court exercises free review over statutory interpretation because it presents a question of law." *State v. Amstad*, 164 Idaho 403, 405, 431 P.3d 238, 240 (2018). In addition, whether an insurance policy is ambiguous is a question of law over which this Court exercises free review. *McFarland v. Liberty Ins. Corp.*, 164 Idaho 611, 615, 434 P.3d 215, 219 (2019).

## III.  ANALYSIS

### A.  The Policy expired by its own terms and did not require notice of cancellation pursuant to Idaho Code section 41-2401(1)(j) for coverage to effectively terminate.

On appeal, the Zechs argue the district court erred in determining that the Policy expired at the end of its policy period, July 2, 2019, after the Zechs failed to accept United Heritage's offer of renewal by making timely payment. The Zechs essentially maintain that the Policy automatically renewed and United Heritage had to affirmatively cancel the Policy to terminate coverage. Because of this, they contend the notice of cancellation provisions for fire insurance in Idaho Code section 41-2401(1)(j) and the Policy extended coverage through the date of the fire.

The Zechs correctly point out the Policy required United Heritage to provide a ten-day notice of cancellation for non-payment of premium, after the non-payment occurs. Idaho Code section 41-2401(1)(j) requires the same but adds, by law, that the ten-day period beings to run five days following the postmark if the notice is sent via U.S. mail. In total, under section 41-2401(1)(j), the notice period is fifteen days before cancellation of coverage for non-payment takes effect. The Zechs argue the Policy was in effect past July 2, 2019, the renewal due date, and was not cancelled until July 10, 2019, when United Heritage mailed the Notice of Cancellation. Fifteen days from this mailing is July 25, 2019. The fire occurred on July 22, 2019. Thus, if the fifteen-day cancellation notice requirement under section 41-2401(1)(j) does apply,

7

the Zechs are correct that coverage would exist at the time of the fire.

United Heritage maintains that the Policy only renewed if United Heritage offered renewal *and* the Zechs accepted that offer by making a timely renewal premium payment. The Zechs did not pay the renewal premium by its due date. Thus, the Zechs did not accept United Heritage's offer and the Policy expired at the end of its term before the fire occurred. Notice of "cancellation" for nonpayment under section 41-2401(1)(j) was not required to terminate coverage because there was no policy in effect to cancel. We agree with United Heritage. Accordingly, for the reasons below, we affirm the district court's decision that the Policy expired on July 2, 2019.

### 1. The Policy unambiguously required the Zechs to accept United Heritage's offer of renewal by making timely payment.

In Idaho, there is no statute or rule governing the operation of renewal for contracts that insure against fire. Therefore, to determine how and when the Policy renews, we must interpret the language of the Policy itself. "This Court construes insurance contracts according to 'the general rules of contract law subject to certain special canons of construction.' " *Progressive Nw. Ins. Co. v. Lautenschlager*, 168 Idaho 841, 845, 488 P.3d 509, 513 (2021) (quoting *Arreguin v. Farmers Ins. Co. of Idaho*, 145 Idaho 459, 461, 180 P.3d 498, 500 (2008)). "Beginning with the plain language of the insurance policy, the first step is to determine whether or not there is an ambiguity." *McFarland*, 164 Idaho at 615, 434 P.3d at 219 (quotation and citation omitted). To determine whether any ambiguity exists, we "construe the policy 'as a whole, not by an isolated phrase.' " *Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co.*, 141 Idaho 660, 663, 115 P.3d 751, 754 (2005) (quoting *Selkirk Seed Co. v. State Ins. Fund*, 135 Idaho 434, 437, 18 P.3d 956, 959 (2000)). The language of an insurance policy is ambiguous "if it is subject to conflicting but reasonable interpretations." *Cascade Auto Glass, Inc.*, 141 Idaho at 663, 115 P.3d at 754. If the policy language is not ambiguous, we give effect to plain and ordinary meaning of the words used in the policy. *Id*. at 662, 115 P.3d at 753.

When it comes to renewal, if "there is no clause in the policy expressly granting a privilege or imposing a duty of renewal, neither party has any right to require a renewal." 2 Couch on Ins. § 29:5 (3d ed. 2021). "Whether the contract of insurance requires the insurer to renew the policy is, by virtue of the parol evidence rule, to be determined from the face of the contract." *Id*. at § 29:9. So long as no statute or rule prohibits it, effecting renewal may be

expressly conditioned, by the insurer, on timely payment of the renewal premium. *Id*. at §§ 29:4, 29:20; *accord Luedke v. Audubon Ins. Co.*, 874 So.2d 1029, 1033 (Miss. Ct. App. 2004); *Texas Farm Bureau Underwriters v. Rasmussen*, 410 S.W.3d 335, 337 (Tex. App. 2013); *First Nat. Bank in Sioux City v. Watts*, 462 N.W.2d 922, 925 (Iowa 1990); *Tomeoka v. Mid-Century Ins. Co.*, 577 P.2d 245, 248 (Ariz. 1978); *Shepard v. U. S. Fid. & Guar. Co.*, 504 P.2d 228, 229 (Kan. 1972); *Waynesville Sec. Bank v. Stuyvesant Ins. Co.,* 499 S.W.2d 218, 220 (Mo. Ct. App. 1973). If this condition precedent fails, renewal does not occur, and coverage terminates at the end of the policy period through expiration. *See Watts*, 462 N.W.2d at 927; *Rasmussen*, 410 S.W.3d at 338; *Luedke*, 874 So.2d at 1033.

Here, the Policy contained a "Policy Period" provision that expressly provided the conditions under which the Policy would renew for a successive term:

> This policy applies only to loss in Section I or in Section II to "bodily injury," "property damage," or "personal injury," that occurs during the *policy term as shown on the declarations. The policy expires at the end of that period and will not be extended unless "we" offer renewal and "you" accept that offer as evidenced by payment of premium for the new policy period*[.]

(Emphasis added.)

This provision clearly stated that the Policy "expires" at the end of the term as stated in the relevant declarations page "unless": (1) United Heritage offers renewal; and (2) the Zechs accept that offer "as evidenced by payment of premium for the new policy period[.]" If the Zechs do not accept United Heritage's offer of renewal by paying the renewal premium by its due date, the Policy "expires" because the condition precedent for renewal fails. Moreover, there is no language in the Policy imposing a duty of renewal on either the Zechs or United Heritage. In sum, the "Policy Period" provision conditioned the occurrence of renewal through offer, acceptance, and consideration.

Applying this provision to the facts of this case, the Policy expired by its own terms on July 2, 2019. The Policy covered the Rental for a term of one year—from July 2, 2018, to July 2, 2019. In May of 2019, the Zechs received the Declarations Page from United Heritage offering to renew the Policy for another one-year term from July 2, 2019, to July 2, 2020. The Declarations Page stated that "COVERAGE WILL EXPIRE AT 12:01 A.M. ON DUE/EFFECTIVE DATE IF NOT PAID." After receiving the Declarations Page, the Zechs received the Bill and Reminder Notice from United Heritage. Both reiterated that the renewal

premium due date was July 2, 2019, and that "COVERAGE WILL TERMINATE AT 12:01 A.M. ON DUE DATE IF NOT PAID." United Heritage did not receive the renewal premium from the Zechs by the renewal due date, July 2, 2019. Indeed, the Zechs did not send the Payment until fourteen days after the date required for effective acceptance. Accordingly, the Zechs did not accept United Heritage's offer of renewal in the manner required by the "Policy Period" provision. Without acceptance, the Policy expired by its own terms on July 2, 2019.

Of note, the Zechs are correct that the Declarations Page does not expressly state that it is an "offer" for renewal as contemplated by the "Policy Period" provision. Nevertheless, the absence of the word "offer" or reference to the "Policy Period" provision does not, *without more*, make the express condition precedent for renewal in the "Policy Period" provision ambiguous. "Generally, delivery of a renewal policy by the insurer to the insured upon the expiration of a policy without request by the insured is an offer or proposal to effect a contract of insurance." 2 Couch on Ins. § 29:17 (3d ed. 2021). Here, United Heritage delivered the Declarations Page to the Zechs stating the policy type was "Renewal" for a new policy period from July 2, 2019, to July 2, 2020. This was an offer to extend the Policy for a new one-year term of insurance. The language in the "Policy Period" provision unambiguously describes this process. Accordingly, although the Declarations Page could have been clearer, the absence of the term "offer" does not give rise to two reasonably conflicting interpretations on how and when the Policy may renew.

**2. The Zechs' reliance on the notice requirements in Idaho Code section 41-2401(1)(j) is misplaced.**

The Zechs contend that the district court erred when it ruled the notice of cancellation provisions set forth in Idaho Code section 41-2401(1)(j) did not extend coverage to July 25, 2019. The Zechs fundamentally conflate the separate ways in which an insurance policy may terminate. Broadly stated, there are three ways insurance coverage may terminate. The first is where an insurer takes an action to terminate a policy during its effective term prior to its expiration, i.e., "cancellation" mid-term. *See* 2 Couch on Ins. § 30:1 (3d ed. 2021); *see e.g.*, *Auto. Club Ins. Co. v. Jackson*, 124 Idaho 874, 877, 865 P.2d 965, 968 (1993) (holding a ten-day notice of cancellation was required to terminate coverage for a non-payment during the term of insurance). Notably, if a policy automatically renews by its own terms every policy period (e.g., every year), then termination of coverage is effectively always "mid-term" because the policy is continuously in effect until affirmatively cancelled.

10

The second is where an insurer elects *not* to renew a policy at the end of its policy term and there is no requirement by statute, rule, or in the policy, imposing a duty of renewal, i.e., "nonrenewal" by the insurer. *See* 2 Couch on Ins. §§ 30:1, 29:5 (3d ed. 2021). The third is where a policy expires at the end of its express term, i.e., there is a "lapse" in coverage. *Id*. at §§ 30:1, 29:16. This may occur, like in this case, when an insurer offers to renew a policy for a successive term, but the offer is not accepted by the insured through a timely payment of the renewal premium. *See id*. at § 29:16; *see, e.g.*, *Rasmussen*, 410 S.W.3d at 337; *Luedke*, 874 So.2d at 1034; *Tomeoka*, 577 P.2d at 248; *Waynesville Sec. Bank,* 499 S.W.2d at 220; *Travelers Indem. Co. v. Fields*, 317 N.W.2d 176, 185 (Iowa 1982).

Here, there is no language in the Policy, or in any statute, which required United Heritage to notify the Zechs that the Policy had expired. Indeed, notice is only required to terminate a fire policy when the insurer terminates the policy mid-term (i.e., cancellation), or elects not to renew:

> STANDARD FIRE POLICY. (1) No fire insurer shall issue any fire insurance policy covering on property or interest therein in this state, other than on the form known as the New York standard as revised in 1943, except as follows:
>
> . . . .
>
>> (j) Every fire policy shall contain language that provides for a thirty (30) day written notice to the insured prior to cancellation of the policy, provided however, that where cancellation is for the nonpayment of premium, at least ten (10) days' notice of such cancellation, accompanied by the reason for the cancellation, shall be given. If delivered via United States mail, such ten (10) day notification period shall begin to run five (5) days following the date of postmark. Proof of mailing of notice of cancellation, or of intention not to renew, or of reasons for cancellation or nonrenewal to the named insured at his address shall be sufficient proof of notice.

I.C. § 41-2401(1)(j).

Nothing in section 41-2401(1)(j) required United Heritage to provide notice of cancellation when coverage terminated through expiration of the policy because the insureds failed to timely accept an offer of renewal. We need not address whether the ten-day notice of cancellation provision in the Policy applies because even if it did, coverage would only be extended to July 20, 2019—two days before the fire.

### 3. The interpretation of an unambiguous insurance policy is not controlled by the parties' incorrect interpretations.

The Zechs maintain that their broad interpretation of "cancellation" should

nevertheless be adopted because it is a reasonable one from the point of view of *both* the Zechs *and* United Heritage. The Zechs assert that United Heritage interpreted the Policy and Idaho Code section 41-2401(1)(j) as requiring notice of cancellation prior to termination of the Policy. For example, in 2018, the Zechs missed the deadline for a renewal premium payment for the Policy and two other policies. United Heritage sent a "Notice of Cancellation" purporting to "cancel" the policies for non-payment. The next year, after the Zechs missed the July 2, 2019, renewal due date for the Policy, United Heritage again sent a "Notice of Cancellation."

Days after the fire occurred, the director of underwriting at United Heritage also interpreted the Policy as requiring "cancellation" to terminate coverage by explaining in a letter to Zechs that sufficient prior notice of "cancellation" was given "in accordance with both the Policy and Idaho [Code] [section] 41-2401(1)(j)." In addition, after the Zechs filed a complaint with the Department of Insurance, a regulatory compliance analyst for United Heritage reiterated the director's interpretation of how the Policy terminated. Neither agent of United Heritage apparently realized that the "cancellation" notice requirement for nonpayment of premium under Idaho Code section 41-2401(1)(j)—if it applied—meant coverage did not terminate until fifteen days *after* the "Notice of Cancellation" had been mailed. In other words, coverage would not have terminated until three days after the fire.

While the Zechs understandably cry foul in this case given United Heritage's explanation for the denial, the explanations given do not change the plain and unambiguous language of the Policy or Idaho Code section 41-2401(1)(j). An insurance contract is not interpreted based on the understanding of the parties—either the insured or insurer—unless the language of the contract is ambiguous. *See Casey v. Highlands Ins. Co.*, 100 Idaho 505, 509, 600 P.2d 1387, 1391 (1979); *Farmers Ins. Co. of Idaho v. Talbot*, 133 Idaho 428, 434, 987 P.2d 1043, 1049 (1999). "[I]f the contract is clear and unambiguous, its interpretation is for the court, and not for the parties, even though the parties by their acts may have evidenced a construction differing from that evidenced by the written instrument." 2 Couch on Ins. § 21:7 (3d ed. 2021). In other words, when a court is tasked with *interpreting* an insurance contract, the insured cannot "bind" an insurer—or the court—to an interpretation of policy language made by an agent of the insurer when it conflicts with the clear and unambiguous provisions of the policy. 3 Couch on Ins. § 50:12 (3d ed. 2021).

12

Here, the law does not bind United Heritage to its previously incorrect interpretation of the Policy, *under a contractual interpretation theory*, when the Zechs have not shown the Policy to be ambiguous. Accordingly, we affirm the district court's grant of summary judgment to United Heritage that the Policy expired by its own terms on July 2, 2019, and that the fifteen-day cancellation notice requirement under Idaho Code section 41-2401(1)(j) does not apply to extend coverage.

## B. United Heritage did not voluntarily relinquish its right to lapse the Policy under the "Policy Period" provision.

The Zechs next argue that United Heritage had already "processed and accepted" the late Payment but later tried to "undo" its acceptance by returning the Payment once it learned about the fire. From this, the Zechs argue United Heritage waived its right under the "Policy Period" provision to lapse the Policy on the renewal premium due date. United Heritage responds that the late renewal Payment was a counteroffer, and that United Heritage did not, as a matter of law, "accept" this counteroffer such that it voluntarily relinquished its right to lapse the Policy. The district court agreed with United Heritage and dismissed the Zechs' affirmative waiver defense. We affirm.

"Because provisions for forfeiture, lapse, or suspension for nonpayment of premiums, assessments, or dues are for the benefit of the insurer, the insurer may waive, or may be estopped to assert, this provision through its conduct or words." 5 Couch on Ins. § 78:1 (3d ed. 2021). "Waiver is a voluntary, intentional relinquishment of a known right or advantage." *Stoddard v. Hagadone Corp.*, 147 Idaho 186, 191, 207 P.3d 162, 167 (2009). Taking the facts constituting waiver as true, a court may determine if such facts "suffice as a matter of law to show waiver." *Knipe Land Co. v. Robertson*, 151 Idaho 449, 458, 259 P.3d 595, 604 (2011).

Here, the district court correctly concluded that the facts asserted by the Zechs were not sufficient to show waiver as a matter of law. It is well understood that when dealing with a contract for services, a payment made after the set time for acceptance constitutes a counteroffer, which must in turn be accepted by the original offeror to create a contract. *Bros. v. Arave*, 67 Idaho 171, 176, 174 P.2d 202, 205 (1946); 17A Am. Jur. 2d Contracts § 75 (2d ed. 2022). The late renewal Payment by the Zechs was a counteroffer for reinstatement because it did not conform to the manner of acceptance prescribed by United Heritage—the original offeror. The district court correctly determined that United Heritage did not "accept" this counteroffer from

13

the Zechs and voluntarily relinquish its right to assert a lapse of the Policy by operation of the "Policy Period" provision.

The Zechs press their position on appeal by citing *Edwards v. State Farm*, 980 N.E.2d 87 (Ill. App. Ct. 2012), in support of their argument that there is a material question of disputed fact over whether United Heritage accepted the late Payment. However, the Zechs' reliance on *Edwards* is misplaced. In *Edwards*, the insured's automobile insurance policy was cancelled mid-term for non-payment of premium. *Id.* at 88. The insured was in an accident one month after cancellation of the policy, but still made a late premium payment by sending the insurer a check. *Id.* The insurer attempted to cash the check and made representations to the insured about allowing reinstatement and coverage. *Id.* at 88, 89. However, payment on the check was denied because of insufficient funds in the account. *Id.* at 88. The court in *Edwards* found there was a genuine dispute of material fact over whether acceptance and waiver occurred based on the insurer's attempt to cash the late payment and the insurer's representations of acceptance to the insured. *Id.* at 89.

In this case, United Heritage received the late renewal Payment on Thursday, July 18, 2019, stamped it as "received," and transmitted it to its underwriting department for review. The underwriting department did not review the Payment on Friday, July 19, 2019, and the department was closed that Saturday and Sunday. United Heritage still had not reviewed the Payment when the fire occurred on Monday, July 22, 2019. It was not until the day after the fire, Tuesday, July 23, 2019, that United Heritage learned of the fire and one of its underwriters first reviewed the late renewal Payment. One day after that, United Heritage returned the late Payment, denied coverage existed under the Policy at the time of the fire loss, and denied reinstatement for the Policy. Unlike the insurer in *Edwards*, United Heritage never attempted to cash the late Payment and did not make any representations to the Zechs, by way of conduct or words, that the late Payment would be, or was, accepted. United Heritage merely "received" the late Payment, reviewed *whether* to accept it, and returned it within six days.

We hold that these facts, as a matter of law, are not sufficient to raise a dispute of material fact over whether United Heritage accepted the late Payment and voluntarily relinquished its right to lapse the Policy. Furthermore, the Zechs' "acceptance" argument is the only theory of waiver the Zechs advanced below and on appeal. Thus, we affirm the district court's dismissal of the Zechs' waiver defense.

14

**C. United Heritage is not equitably estopped from denying reinstatement of the Policy because the Zechs did not have a right to reinstatement after lapse.**

The Zechs argue the district court erred in dismissing their equitable estoppel defense at summary judgment. Based on United Heritage's course of conduct, the Zechs contend the only preconditions for reinstatement of a lapsed policy, are: (1) paying the renewal premium; (2) paying the reinstatement fee; and (3) certifying no loss occurred between the premium due date and the date the premium was *received* by United Heritage—*not* the date the Zechs actually signed the Statement of No Loss form. The Zechs maintain that so long as they can meet these three preconditions, United Heritage is estopped from denying reinstatement of the Policy after lapse. In response, United Heritage argues the district court correctly dismissed the Zechs' estoppel defense as a matter of law because estoppel cannot be used as the basis for "creating" rights or coverage where none exists. United Heritage maintains it never made any promises or agreements with the Zechs that they would always be entitled to reinstatement so long as they met certain preconditions. We agree with United Heritage and affirm the district court's dismissal of the Zechs' equitable estoppel defense.

As a preliminary matter, the district court erred by applying the *general* equitable estoppel standard we articulated in *Knudsen v. Agee*, 128 Idaho 776, 779, 918 P.2d 1221, 1224 (1996), instead of the insurance-specific standard we recognized in *Lewis v. Continental Life & Accident Company*, 93 Idaho 348, 351, 461 P.2d 243, 246 (1969). An estoppel claim in the insurance context requires proof of two elements: "(1) reasonable reliance on inducements in the form of promises or agreements with the insurance company and (2) the insurer's realization of a profit from its change in position." *Shapley v. Centurion Life Ins. Co.*, 154 Idaho 875, 881, 303 P.3d 234, 240 (2013). Applying the proper standard, we affirm the district court's grant of summary judgment.

"The purpose of the doctrine of estoppel in insurance cases is to enforce the contract as originally agreed upon by the parties." *Lewis*, 93 Idaho at 353, 461 P.2d at 248. Equitable estoppel cannot be used to create new rights never promised or agreed upon. *See Lewis*, 93 Idaho at 353, 461 P.2d at 248; *Putzier*, 100 Idaho at 887–88, 606 P.2d at 991–92. Neither the insurer, nor the insured, can use equitable estoppel to write a new contract of insurance. *Lewis*, 93 Idaho at 353, 461 P.2d at 248; *Foremost Ins. Co. v. Putzier*, 100 Idaho 883, 887–88, 606 P.2d 987, 991–92 (1980). As a shield, estoppel can only be used to prevent the parties from replacing the

15

"original bilateral agreement" with one party's own "unilaterally drafted insurance form." *Lewis*, 93 Idaho at 353, 461 P.2d at 248.

The Zechs rely on *Saunders v. Lloyd's of London*, 779 P.2d 249 (Wash. 1989) (en banc) to argue that United Heritage should be estopped from denying reinstatement of the lapsed Policy. The Zechs' reliance on *Saunders* is misplaced. The *Saunders* court dealt with estoppel in the context of renewal and an insured's right to continuous coverage regardless of timely renewal payments. *Id*. at 256. In *Saunders*, the insurance contract was for a one-year term with a stated expiration date. *Id*. at 251. However, the insurer sent renewal notices each year that neither specified a renewal payment date, nor stated that coverage would terminate if payment was not received by the expiration date. *Id*. at 256. For two years in a row, the insurer accepted renewal payments made after the policy's expiration date without notifying the insured that there was no coverage for the period between the expiration and late renewal payment. *Id*. Moreover, there was no provision in the policy addressing the operation of renewal. *See id*. at 251.

From this, the court allowed the insured's estoppel defense to proceed to the jury based on the insurer's course of conduct evidencing the insured's right to continuous renewal regardless of timely payment by the policy's expiration date. *Id*. at 256. The court held that "[r]easonable minds could conclude that the insured justifiably relied to his detriment on the insurers' practices of backdating to believe prompt payment was not necessary for continuous coverage." *Id*. at 252. In other words, the terms of renewal in *Saunders*, although not "[t]echnically" supporting automatic renewal, evidenced the insured's right to continuous coverage and renewal under the policy based on the insurer's course of conduct. Thus, the *Saunders* court permitted the insured to estop the insurer from denying this right, i.e., that a lapse ever occurred. It did not allow equitable estoppel to be used to create a non-existent right.

Here, the Zechs' "course of conduct" estoppel argument relates only to the operation of reinstatement—not renewal. Regarding reinstatement, the Policy contains no language providing the Zechs any right—absolute or otherwise—to reinstatement after a lapse. In fact, the Policy omits the subject of reinstatement altogether. The Zechs are correct that United Heritage has in the past granted the Zechs reinstatement on many occasions. The Zechs are also correct that in granting reinstatement, United Heritage only required the Zechs to: (1) pay the late renewal premium; (2) pay a reinstatement fee; (3) and certify no loss occurred up to the date United Heritage *received* the late renewal payment. The Zechs did not, however, present any evidence

16

that United Heritage made a *promise* to the Zechs, or an *agreement* with the Zechs, that could bestow upon the Zechs a *right* to reinstatement that survives the lapse of the Policy. Moreover, unlike the insurer in *Saunders* who engaged in a course of conduct giving the insured a right to *continuous* coverage, United Heritage did not engage in a course of conduct giving the Zechs a right to effect reinstatement after lapse regardless of United Heritage's consent. At most, United Heritage engaged in a course of conduct giving the Zechs a *right to apply for* or *offer* reinstatement after a lapse that United Heritage was free to reject. *See* 2 Couch on Ins. § 33:8 (3d ed. 2021) (distinguishing between an insured's right to effect a reinstatement upon application and an insured's right to make an offer for reinstatement that an insurer may accept or reject).

In this case, United Heritage received the Zechs' application for reinstatement by way of the late renewal payment on July 18, 2019. At this point, the Policy had been expired for sixteen days. The Zechs' application was an offer to reinstate that United Heritage was free to reject. The fire occurred on July 22, 2019. The next day, United Heritage reviewed the Zechs' offer for the first time. One day after that, United Heritage rejected the offer by returning the late renewal Payment to the Zechs and refusing to reinstate the Policy. Because the Zechs did not show they have a *right* to reinstatement after lapse, they cannot estop United Heritage into accepting their offer to reinstate. In other words, the Zechs cannot use estoppel as a sword to create a right to reinstatement after lapse where none exists under the Zechs' original bilateral agreement with United Heritage. *See Lewis*, 93 Idaho at 353, 461 P.2d at 248. Therefore, we affirm the district court's grant of summary judgment on the Zechs' equitable estoppel defense.

**D. Costs and attorney fees on appeal.**

The Zechs request attorney fees on appeal under Idaho Appellate Rule 41 and Idaho Code section 41-1839(1). An insured cannot recover attorney fees under section 41-1839(1) if they are not entitled to payment for the claimed loss. *See* I.C. § 41-1839(1). Here, the Policy lapsed before the fire occurred and United Heritage cannot be deemed to have accepted the Zechs' offer of reinstatement through its actions or by estoppel. Therefore, the Zechs cannot recover attorney fees under section 41-1839(1) on appeal because they are not entitled to any payment from United Heritage. As the prevailing party in this appeal, United Heritage is entitled to costs as a matter of right. *See* I.A.R. 40.

## IV.  CONCLUSION

The judgment of the district court granting United Heritage declaratory relief and

dismissing the Zechs' affirmative defenses and counterclaims is affirmed.

Chief Justice BEVAN, and Justices MOELLER and ZAHN, concur.


STEGNER, J., dissenting.

I respectfully dissent from the majority's opinion for two reasons. First, the district court utilized the incorrect legal standard for equitable estoppel involving an insurance company. Second, I disagree with the majority's application of the correct standard: when applying the correct standard, it is my view that the Zechs have adequately raised a genuine issue of material fact as to whether United Heritage should be estopped from denying them coverage. Therefore, I would conclude that the district court erred in granting United Heritage's motion for summary judgment.

I begin my analysis with the general principle that "[t]he doctrine of estoppel prevents the insurer from denying coverage based on printed provisions in the policy that conflict with representations by the insurer or its agents on which the policy holder reasonably relied." *Shoup v. Union Sec. Life Ins. Co.*, 142 Idaho 152, 155, 124 P.3d 1028, 1031 (2005). For cases involving insurance contracts, this Court utilizes the modified estoppel test laid out in *Lewis v. Continental Life and Accident Company*:

> [W]here a policy holder is induced to enter into contract in reasonable reliance on promises of or agreements with the soliciting representative of that insurance company thereby leaving the insured person or property otherwise unprotected, and the company profits from that change of position, that the insurance company is estopped to deny the liability for which it actually contracted by raising provisions from its own printed policy form.

*Shoup*, 142 Idaho at 155, 124 P.3d at 1031 (quoting *Lewis*, 93 Idaho 348, 351, 461 P.2d 243, 246 (1969)). This Court also considers an insurer's past conduct when determining whether the insured may have reasonably relied on the insurer's representations. *Id.* Reasonable reliance is ordinarily a fact to be determined by a jury. However, when summary judgment is granted, as it was here, the Zechs are deprived of that assessment.

Notably, the test for equitable estoppel in the insurance realm is different from the general test. The general test, used by the district court below, requires:

> (1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth, (2) the party asserting estoppel did not know or could not discover the truth, (3) the false representation or concealment was

18

made with the intent that it be relied upon, and (4) the person to whom the representation was made or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice.

*Knudsen v. Agee*, 128 Idaho 776, 779, 918 P.2d 1221, 1224 (1996). However, as pointed out by the majority, this general rule does not apply in the insurance contract realm. I agree with this premise; the Idaho cases discussing equitable estoppel with regard to insurance contracts rely exclusively on the *Lewis* rule. *See e.g.*, *Shoup*, 142 Idaho at 154–55, 124 P.3d at 1030–31; *Foster v. Johnstone*, 107 Idaho 61, 67, 685 P.2d 802, 808 (1984).

Importantly, the *Lewis* test is different and easier to prove than the general test: there is no requirement under the *Lewis* test that there be a false representation by the insurer or that the insured be unable to ascertain the truth, nor is there a requirement that the insurer intended to induce reliance. The *Lewis* test is therefore less onerous than the general test. This is unsurprising because "Idaho law acknowledges that insurance contracts are not entered into in the same fashion as other contracts." *Shoup*, 142 Idaho at 154, 124 P.3d at 1030. Rather, this Court "recognize[s] that a consumer generally cannot be expected to understand the terms and defenses of an insurance contract, that he frequently enters into a contract before even being provided a copy of the policy, and that he is not normally in a position to negotiate its written terms." *Id.*

The district court erroneously applied the general test. The district court reasoned that the Zechs had not shown any "false representations" on behalf of United Heritage, nor had they pointed to facts they were not aware of. The district court's analysis thus relies on the first two elements of the general estoppel test. Because the district court utilized the incorrect, more onerous legal standard, I would reverse.

The majority recognizes that the district court applied an erroneous standard and attempts to cure this error by analyzing the Zechs' argument under the correct *Lewis* standard. Although I agree that the *Lewis* test is the correct approach, I disagree with the majority's application of *Lewis* here. Instead, I would reverse the district court's grant of summary judgment on the merits. Properly applied, the insurance-specific doctrine of estoppel prevents an insurer from going against its own policy or practice in some way and subsequently trying to enforce that same policy against the insured at some later date. This includes policy terms requiring payment by a specific date:

19

>An insurance company cannot insist on a forfeiture for failure to pay premiums in accordance with the terms of the policy when its course of dealing has been such as to induce the belief in the insured that strict compliance with such provisions will not be insisted on, as where it has been its custom to receive premiums after they are due. That is, an insurer's course of dealing may be sufficient to establish a custom to receive an insured's overdue premium payments without objection, giving rise to an honest, reasonably founded belief on the part of the beneficiary that the payment of premiums is current, such that the insurer will be estopped from treating the policy as lapsed.

46 C.J.S. *Insurance* § 1215 (May 2022) (footnotes omitted). Therefore, an insurer's course of conduct in accepting late payments may independently give rise to estoppel if the insurer suddenly attempts to strictly enforce payment due dates in order to deny coverage.

I note, however, that an insurer is not always prevented from enforcing such a policy against an insured. Rather, the insurer must simply take additional steps to notify the insured that the custom of accepting late payments is no longer in place and the policy will begin to be enforced:

>An insurance company's custom to accept payments not in compliance with contract requirements does not change the contract, but merely operates as a waiver or estoppel precluding the insurance company from taking advantage of the noncompliance to declare a forfeiture, and termination for the custom may forestall a waiver or estoppel against the insurance company and enable it thereafter to take advantage of the contractual ground for forfeiture. However, *to terminate the custom, the insurance company must give reasonable notice thereof*.

*Id.* (footnotes omitted, italics added).

This is applicable to reinstatement as well as payments occurring within the term period. "[S]pecial circumstances may appear justifying the conclusion that the conduct of the insurer subsequent to the insured's application for reinstatement . . . estops it from denying reinstatement." 43 AM. JUR. 2D *Insurance* § 466 (May 2022) (footnote omitted). "Where the right of reinstatement is given the insured, the insurer is bound to consider the application for reinstatement on its merits and may not act arbitrarily, or capriciously, or in bad faith." 43 AM. JUR. 2D *Insurance* § 460 (May 2022) (footnote omitted). "An insurer's obligation of good-faith dealing is just as applicable to matters involving reinstatement as it is to claims handling procedures." 2 COUCH ON INS. § 33:10 (3d ed. 2021). If an insurer, "while retaining the insured's premium, preserved an option to either approve or disapprove of reinstatement in its absolute discretion, the insurance company would gain an unconscionable advantage: it would in effect

20

collect the premiums but assume no risk of loss." *Ryman v. American Nat. Ins. Co.*, 488 P.2d 32, 42 (Cal. 1971). As explained by the California Supreme Court in *Ryman*:

> A procedure that gives the insurer complete discretion to accept or reject applications for reinstatement while retaining tendered premiums is clearly inequitable. If, on the one hand, the risk against which the individual wants insurance does not occur during the time the company ponders over the application, the insurer can approve reinstatement and retain the insured's premium for coverage ostensibly provided over that span of time. If, on the other hand, the very risk against which an insured seeks protection should eventuate during this decision-making period, the company, exercising its absolute discretion, can simply deny reinstatement and return the premium. In other words, if an insurer retained an absolute discretion to approve or disapprove reinstatement throughout the period, an insured would have purchased rather unique insurance in which the 'umbrella' of coverage would be open only in the sunshine and would close automatically at the first sign of rain.

*Id.* (footnote omitted).[1] Thus, estoppel may operate to reinstate a policy when "the insured has performed the necessary conditions precedent and has perfected his or her application." 43 AM. JUR. 2D *Insurance* § 466 (May 2022) (footnote omitted).

It is my view that the Zechs have pointed to evidence that they reasonably relied on United Heritage's past conduct of accepting late payments and reinstating their policies. The Zechs point out that they had paid their premiums past the due date on multiple occasions, and they had always signed a Statement of No Loss prior to reinstatement of the Policy. Importantly, the Zechs assert that the Statement of No Loss, although purportedly requiring the Zechs to certify no loss had occurred between the "cancellation date" and the "date and time signed," was actually prepopulated with a date range covering the cancellation date to the date United Heritage *received* the premium payment. This is borne out by the record, and United Heritage does not contend otherwise. If United Heritage had handled the Zechs' late payment in the way it had in the past, the Zechs would have been covered by the policy.

Notably, United Heritage argues on appeal that had it sent the Zechs a Statement of No Loss to sign after the fire occurred, the Zechs would have committed fraud by signing it because they would have known about the fire at the "date and time signed." However, United Heritage had received several Statements of No Loss signed by the Zechs with the "date and time signed"

---

[1] Unlike the Policy here, the insurance policy at issue in *Ryman* contained a reinstatement clause. 488 P.2d at 36–37. As explained below, United Heritage's conduct gave the Zechs a right to reinstatement of the Policy. As such, even though the terms of the policy in *Ryman* are factually distinguishable from the terms of the Policy here, the California Supreme Court's discussion in *Ryman* remains illustrative and persuasive.

line prepopulated with the date United Heritage had received the late payment. It appears that, not only was United Heritage the entity that prepopulated the date on the prior forms, United Heritage had no qualms about the dates on the prior forms because it routinely chose to reinstate coverage under the Policy.

Additionally, after United Heritage refused to reinstate the policy on the burned property, it still allowed the Zechs to reinstate the three other policies with past-due premiums once they signed the Statement of No Loss for a particular property. Those Statements of No Loss were also prepopulated with the date United Heritage received the late payment check, July 18, 2019, rather than being left open for the Zechs to fill out the actual "date and time signed." This reinforces the Zechs' contention that United Heritage engaged in a course of conduct which deviated from its prior course of dealing. That is the whole point of estoppel: it prevents an insurer from behaving differently from the way it has in the past.

Furthermore, United Heritage's decisions to apply any accepted late reinstatement payments retroactively to the period for which the Zechs certified no loss had occurred places this case squarely within the equity concerns discussed in *Ryman*. For example, in July 2018 the Zechs also paid their renewal premium for the now-burned property late, and United Heritage deemed the policy cancelled as of July 4, 2018. Gayla Zech signed a Statement of No Loss, certifying that no loss had occurred between July 2 and July 16, 2018. United Heritage reinstated the policy, with a "Reinstatement Date" of July 4, 2018, and an "Effective Date" of July 2, 2018. Thus, United Heritage received payment for "coverage" it knew it would never have to actually provide. However, when the Zechs attempted to reinstate the same policy in 2019, United Heritage chose not to reinstate the policy due to the fire. Notably, the fire occurred *after* the date United Heritage received the Zechs' payment, which—pursuant to United Heritage's custom and course of conduct—would have been the date through which the Zechs would have had to certify no loss had occurred. Thus, the "'umbrella' of coverage" United Heritage provided the Zechs was "open only in the sunshine" yet "close[d] automatically at the first sign of rain." *See Ryman*, 488 P.2d at 42. Essentially, United Heritage was trying to have it both ways, and it arguably engaged in unconscionable conduct to do so.

It should be noted that United Heritage points to the written policies contained in the notices sent to the Zechs stating coverage would cease to exist on July 2, 2019, if the Zechs did not pay the premium. However, given United Heritage's prior course of conduct in sending the

22

notices, yet repeatedly allowing the Zechs to "reinstate" coverage upon signing the Statement of No Loss, the written notices do not establish that United Heritage was entitled to relief as a matter of law. Conversely, this argument is precisely what the doctrine of estoppel seeks to prevent: an insurer who engages in a course of conduct at odds with its written policy, but then attempts to strictly enforce its written policy to assert that the insured should have known better. Additionally, there are no facts to suggest that United Heritage in any way notified the Zechs that the insurance company was altering its custom of accepting late payments for reinstatement so long as the Zechs provided a signed Statement of No Loss. Instead, it appears that United Heritage only decided to terminate that custom once it determined that there had been a fire at the property, albeit one that occurred after the Zechs tendered payment and United Heritage received payment. This is further supported by the fact that United Heritage accepted the late payments for the Zechs' other three properties and reinstated coverage pursuant to its previous custom and course of conduct. Thus, while the written notices are undoubtedly relevant to the question of whether the Zechs' reliance on United Heritage's course of conduct was reasonable, that is ultimately a question for the factfinder to decide. *See* 46 C.J.S. *Insurance* § 1215 ("The question of whether an insurance company's conduct or custom, with respect to the acceptance of premiums, causes an estoppel to arise is a question for the jury." (footnote omitted)); *see also Shoup*, 142 Idaho at 155, 124 P.3d at 1031 ("Whether a party's reliance was reasonable is a question of fact for the jury.").

Relying on *Couch on Insurance*, a well-known tome on insurance law, and *Saunders v. Lloyd's of London*, 779 P.2d 249 (Wash. 1989) (en banc), the majority concludes that the Zechs did not have a right to reinstatement and thus cannot estop United Heritage from denying their application for reinstatement. *Couch* instructs that, "[i]n the absence of regulatory statute, whether the insured has a right to reinstate the policy, as distinguished from merely the freedom of contract to make an offer of reinstatement which may or may not be accepted by the insurer is determined from the contract of insurance." 2 COUCH ON INS. § 33:8 (3d ed. 2021) (footnote omitted); *see also* 43 AM. JUR. 2D *Insurance* § 380 (May 2022) ("Absent an express provision of the policy, or an applicable statute, an insurer has no legal duty to renew an insurance policy once its term has expired, for any reason." (footnotes omitted)). While the Idaho Legislature has mandated a right to reinstatement for life and disability insurance policies, it has not done so with respect to property insurance policies. *See* I.C. § 41-1911 (granting a statutory right to

23

reinstatement for life insurance policies); I.C. § 41-2108 (granting a statutory right to reinstatement for disability insurance policies). Additionally, there is not a reinstatement clause in the Policy.

However, I would conclude, based on extant law, that an insurer's course of conduct can create a right to reinstatement even where the written Policy does not provide such a right. In *Saunders*—relied upon by the Zechs—the Washington Supreme Court found that estoppel could prevent an insurance company from denying that coverage existed when its prior course of conduct had been to renew (or reinstate[2]) coverage after receiving a late renewal payment. 779 P.2d at 250–56. Notably, the court found estoppel could be raised *even though*—as the majority points out—there was nothing in the written policy addressing how the renewal process operated. *See id.* at 251. There is also nothing in the *Saunders* opinion that suggests the policy explicitly contemplated the reinstatement process. *See id.*

The plaintiff in *Saunders* acquired insurance for a rental property located in Spokane, Washington, in June 1983. *Id.* at 250. The policy "stated on its face that it would be effective June 11, 1983[,] through June 11, 1984." *Id.* at 251. "The [insurance] company could elect not to renew by giving written notice 30 days prior to expiration." *Id.*

The next year, on June 5, 1984, the insurance agent sent a notice of renewal to the plaintiff, which provided that the term for the renewal would be one year, effective June 11, 1984, and expiring June 17, 1985. *Id.* The plaintiff did not pay the renewal premium until June 27, 1984, sixteen days after the original policy had expired. *Id.* However, the insurance company accepted the payment and "issued a renewal on July 9, backdated to June 11, 1984." *Id.*

The plaintiff also paid his renewal premium late the following year. *Id.* The insurance agent first sent a renewal invoice to the plaintiff on June 3, 1985. *Id.* Having moved to a new address, the plaintiff requested the insurance agent send him a new bill; the insurance agent did

---

[2] The *Saunders* opinion refers to "renewal" rather than "reinstatement." *See* 779 P.2d at 250–56. However, under the facts of the case, the *Saunders* court was in actuality addressing reinstatement. Though the exact definition of renewal is murky at best, *see* 2 COUCH ON INS. § 29:1 (3d ed. 2021), reinstatement clearly requires "that there be an interval during which the insured no longer is covered by insurance[,]" 2 COUCH ON INS. § 33:4 (3d ed. 2021). Such an interval existed in *Saunders*: the policy at issue had an explicit expiration date. 779 P.2d at 251. Additionally, the insurance company did not issue the "renewal" until after it received payment; only after it received the payment did the insurance company backdate the "renewed" policy to the date the prior policy expired. *Id.* Therefore, there was a lapse in coverage between the expiration date of the original policy and the date the insurance company "renewed" the policy due to the payment. Thus, the *Saunders* opinion inaccurately described the policies as "renewed" rather than reinstated.

so on June 25, 1985. *Id.* The plaintiff paid the premium on July 8, 1985, twenty-one days after the policy had expired. *Id.* The insurance company "renewed the policy dated August 13, again backdating coverage from June 11, 1985[,] through June 11, 1986." *Id.*

On May 20, 1986, the insurance agent again mailed the plaintiff a renewal notice, but the plaintiff did not receive it. *Id.* The plaintiff "neither requested renewal nor paid the premium by June 11, 1986." *Id.* On June 28, 1986, seventeen days after the policy had expired, a tree fell on the plaintiff's rental property. *Id.* The plaintiff offered to pay the renewal premium at that time; however, the insurance company declined the payment and subsequently denied coverage due to the lapse. *Id.*

Asserting that the insurance company had never informed him "that his policy would be terminated if he failed to make a prompt payment[,]" the plaintiff brought suit, arguing in part that the insurance company should be estopped from denying coverage. *Id.* at 252. The Washington Supreme Court first noted that the general rule was that estoppel could not be used to extend coverage beyond the agreement made by the parties. *Id.* However, the court then explained:

> The underlying rationale [for the general rule] is that an insurance company should not be required to pay for a loss for which it received no premium. That rationale supports precluding waiver or estoppel in situations where the insured attempts to broaden coverage to protect against risks not stipulated in the policy or expressly disclaimed. *That rationale cannot, however, support precluding waiver or estoppel where the insurers have previously accepted premium payments for periods for which they provided no coverage.*

*Id.* (internal citations omitted, italics added).

The court ultimately concluded that, even though "the insurer never issued a renewal policy until after payment" and "the facts d[id] not support automatic renewal[,]" the plaintiff was not precluded from arguing estoppel. *Id.* at 254. Relying on the underlying rationale for imposing the doctrine of election against insurers in similar scenarios, the court explained that allowing the insurance company to go against its established course in renewing the policy regardless of whether it received prompt payment could give the company an unconscionable advantage. *Id.* The court held that the plaintiff had presented sufficient evidence that he "justifiably relied on the insurers' practice of accepting late payments, delaying issuing the policy, and backdating coverage without notifying the insured of any gap in coverage or providing a refund" to take the question of estoppel to a jury. *Id.* at 255.

25

Here, like in *Saunders*, the written Policy did not detail the process of reinstatement. Additionally, just as in *Saunders*, United Heritage backdated all prior reinstatements of the Zechs' Policy once they had provided a Statement of No Loss. As discussed above, United Heritage essentially received payment for "coverage" it knew it never needed to actually provide. Therefore, United Heritage "previously accepted premium payments for periods for which [it] provided no coverage." *See Saunders*, 779 P.2d at 252. Thus, although the general rule is that estoppel may not be used as a sword to extend coverage, United Heritage's actions evoke the exception to that rule, and would not preclude the Zechs from arguing estoppel to prevent United Heritage from gaining an unconscionable advantage. (It should be noted that the facts here are more favorable to the Zechs than those in *Saunders*. In *Saunders*, the insureds were allowed to assert estoppel against the insurer even though a premium had not been tendered at the time of loss. In this case, the Zechs tendered and United Heritage received payment of the premium prior to the loss.)

It is true that, unlike in *Saunders*, the Zechs were informed that their Policy would be cancelled if they did not pay the renewal premium by the due date. However, United Heritage engaged in a course of conduct that suggested it had never required strict compliance with its payment deadlines. Rather, United Heritage allowed the Zechs to repeatedly reinstate the Policy so long as they paid the outstanding premium, paid a small reinstatement fee, and signed a Statement of No Loss. Like in *Saunders*, United Heritage then backdated the reinstated policy, effectively erasing any "gap" in coverage from the date of the purported cancellation and the date United Heritage received the Zechs' payment. Estoppel can prevent an insurer from enforcing its policies when the insurer's past conduct was to not strictly enforce that policy. 46 C.J.S. *Insurance* § 1215. "The fact that provisions of the policy have been waived in the past does not bar the insurer from insisting upon compliance with the policy provision thereafter, provided that the insured is given reasonable notice that observance of the policy provisions will be required." 2 COUCH ON INS. § 33:95 (3d ed. 2021) (discussing the "[e]ffect of past course of conduct or dealing" as it relates to waiver and estoppel in the reinstatement context). "That is, the fact that the insurer has been lenient at times with the insured in respect to reinstatement requirements does not preclude the insurer from withdrawing such privileges and insisting upon a strict compliance therewith." *Id.* (footnote omitted). Here, however, there is nothing in the record to suggest United Heritage ever notified the Zechs that it would begin enforcing payment

deadlines, as is required prior to an insurer demanding strict compliance. *See* 2 COUCH ON INS. § 33:95.

It therefore appears clear that this case fits within the holding in *Saunders* and the Zechs should be allowed to argue estoppel at trial because the Policy is silent as to the reinstatement process and because of United Heritage's course of dealing.

Finally, even if the majority is correct in concluding that the Zechs simply made an offer for reinstatement, United Heritage still had an obligation to consider that offer in good faith. *See* 2 COUCH ON INS. § 33:10 (3d ed. 2021) ("An insurer's obligation of good-faith dealing is just as applicable to matters involving reinstatement as it is to claims handling procedures."). Estoppel may operate to reinstate a policy when "the insured has performed the necessary conditions precedent and has perfected his or her application." 43 AM. JUR. 2D *Insurance* § 466 (May 2022) (footnote omitted).

It is undisputed that the Zechs sent (and United Heritage received) the full premium prior to the fire. Additionally, the Zechs could have signed a Statement of No Loss for the property verifying no loss had occurred between the expiration date of the prior policy period and the date United Heritage received the Zechs' payment. Therefore, the Zechs either had performed or could perform the prerequisites necessary—pursuant to United Heritage's past course of conduct—for United Heritage to reinstate the Policy.

As discussed above, equitable estoppel in the insurance context is premised upon the unique nature and power imbalance between the parties to an insurance contract. *See Shoup*, 142 Idaho at 154, 124 P.3d at 1030 ("Idaho law acknowledges that insurance contracts are not entered into in the same fashion as other contracts."). Allowing United Heritage to deny coverage to the Zechs, even though the Zechs met the conditions required for reinstatement that United Heritage unilaterally set, is antithetical to the protections available to insureds under Idaho law. To allow United Heritage to change its course of dealing because it discovered a fire had occurred *after* the date the Zechs would have certified there had been no loss affords United Heritage an unconscionable advantage to which it is not entitled.

In sum, I would hold that the Zechs have shown evidence that they reasonably relied on United Heritage's past conduct. Therefore, they have established a genuine issue of material fact as to whether United Heritage's past conduct should estop the insurance company from denying coverage as it did. Whether that reliance was reasonable is a question of fact best decided by a

jury and not by the district court at the summary judgment stage utilizing the incorrect standard, nor by this Court on appeal utilizing the correct *Lewis* test. Accordingly, I respectfully dissent.