# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49606

PAUL HANKS,                 )
                                        )

    Plaintiff-Appellant,          )         **Boise, May 2023 Term**
                                          )

v.                              )         **Opinion filed: November 28, 2023**
                                          )

CITY OF BOISE; REPUBLIC PARKING )         **Melanie Gagnepain, Clerk**
SYSTEM, LLC, a Tennessee limited liability )
company,                    )
                                        )

    Defendants-Respondents,     )
                                        )

and                              )
                                        )

UNITED COMPONENTS, INC., dba )
ASPHALT MAINTENANCE & PAVING, an )
Idaho corporation,           )
                                        )

    Defendant.                )

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Derrick O'Neill, District Judge.

The decision of the district court is <u>affirmed</u>.

Fisher Hudson Shallat, Boise, for Appellant. Vaughn Fisher argued.

Anderson, Julian & Hull, LLP, Boise, for Respondents. Phillip Collaer argued.

_____

MOELLER, Justice.

This case concerns a slip and fall at the Boise Airport; as such, it requires us to once again consider the legal duties owed to an invitee. In December 2019, Paul Hanks slipped and fell on a patch of ice after exiting a vehicle in the passenger unloading zone at the Boise Airport. Hanks sued the City of Boise, Republic Parking System, LLC, and United Components, Inc. (collectively the "Defendants") for negligence. Hanks argued that the Defendants have a duty to maintain the Boise Airport facilities in a safe condition and that the Defendants failed in that duty by not keeping the passenger unloading zone free of ice. The City of Boise and Republic Parking System, LLC

1

(collectively the "Respondents"), moved for summary judgment, arguing that they had met all legal duties owed to Hanks. The district court agreed and granted summary judgment. Hanks timely appealed. For the reasons discussed below, we conclude that the district court did not err in its grant of summary judgment and affirm the decision of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The general facts of the underlying injury are not in dispute. As the district court explained in its memorandum decision and order:

> On December 16, 2019, Plaintiff arrived at the Boise Airport around 9 a.m. to catch a flight home to Washington. After his vehicle stopped on the Skybridge (the upper deck passenger loading zone), Plaintiff exited from the front passenger door and set both feet on the pavement near the curb area. He did not see anything on the roadway that he felt was slick or otherwise dangerous. As Plaintiff turned to retrieve his luggage from the backseat of the vehicle, he felt a pop and pain in his left knee, fell, struck his kneecap on the asphalt, and sustained injuries. Plaintiff believed he slipped on an icy patch he had not noticed. Plaintiff does not know how long the ice patch was present or what caused it. Photos taken immediately after his fall show a small ice patch on the roadway, but overall there was no accumulation of snow or ice.

Although it was below freezing,[1] there was no snow forecast or recorded for the airport that morning.

Just prior to Hanks' injury at the airport on December 16, the City of Boise changed its road maintenance policy for airport roads—including the airport road on the skybridge. Prior to the change, a city contractor would be dispatched automatically whenever the temperature dropped to 34 degrees or after one inch of snowfall. The new policy changed from an "automatic call out" procedure to a request-initiated procedure. Instead of a sub-contractor applying deicer automatically whenever the temperature was below 34 degrees—even on sunny, dry days—under the new policy road treatment was to be requested as needed by an authorized city representative. Additionally, Republic Parking Systems, the parking contractor for the City of Boise, would inspect, clear, and treat the lots and "loading areas" outside the terminal.

The City of Boise submitted a declaration from Chris Kelly, a parking employee from Republic Parking Systems, explaining his duties and the inspection he conducted the morning of Hanks' injury:

---

[1] The precise temperature at 9:00 A.M. is not in the record; however, the parties agree that it was 19 degrees Fahrenheit at 6:00 A.M.

2. In December of 2019, I was an employee of Republic Parking Systems, LLC. Among other things, my job duties included snow and ice removal in the parking lots and the roadway/loading areas outside the terminal of the Boise Airport. During the winter months, when I arrived at work in the morning I would check the lots and the roadway/loading areas outside the terminal building for snow or ice. If the roadway/loading areas were dry, I would still inspect for ice patches. If I found patches of ice, I would apply granular de-icing material.

3. When I inspected the parking lots and the roadway loading areas, I would initially begin with the loading areas outside the terminal building. I would first inspect the areas on the upper deck or skywalk. . . . When I inspected the roadway/loading areas at the terminal building, if I saw ice patches I would apply granular deicer. Additionally, if saw an ice patch on the sidewalk I would apply granular deicer, although maintaining the sidewalk was not the responsibility of Republic Parking employees. The process of inspecting the loading areas, the parking garage, and the parking lots would, depending on the amount of work needed that day, be completed within 1 to 1.5 hours. . . .

4. After I finished the inspections described in paragraph 3 above, I would document my activities on the Winter Log maintained by Republic Parking. . . . The entries in the log for 6:00 am. were made by myself. I began my inspection at approximately 6:00 am. As outlined above, I would have first inspected the upper deck or skywalk followed by the the [sic] lower deck. I would then proceed to the parking garage, finishing with the outside parking lots. I would have completed that process between 7:00 and 7:30 a.m. I would have then re-inspected the loading areas on the skywalk and the lower deck. I would have applied granular deicer to any ice patches I was able to observe.

While the Boise Airport maintained the roadway loading areas, the sidewalk was maintained by the City of Boise. The City of Boise offered a declaration from Dan Bean, a custodian from the Boise Airport, detailing his duties and explaining that he had also inspected the area the morning of Hanks' injury:

In the winter months my job duties included inspecting and cleaning assigned areas of the airport terminal and the sidewalk outside the terminal building. When inspecting the sidewalk outside the terminal building, I would pick up trash and look for patches of ice or liquid that could freeze on the sidewalk and become slick. Granular deicer was stored at each entry to the terminal building. If I saw ice, I would apply granular deicer to the area. If I saw unfrozen liquid on the sidewalk or in the passenger loading area, I would clean it up with a mop before it could freeze.

. . . .

On the morning of December 16, 2019, I was assigned to the upper deck area, or sky bridge. The upper deck is the unloading area for departing flights. Beginning at approximately 6:00 a.m. I inspected and cleaned the sidewalk area outside the terminal . . . . That inspection process would take a few minutes. If I

3

encountered something that required my attention such as an overturned garbage can, ice patches, or liquid spilled on the sidewalk or curb, the inspection would take more time. I inspected the outside sidewalk every hour during the morning. If I had seen ice on the sidewalk or in the passenger loading area, I would have applied granular deicer. My last inspection of the upper deck area prior to 9:00 a.m. would have occurred shortly after 8:00 a.m.

Importantly, while it is undisputed that Hanks slipped and fell on some sort of ice, Hanks has not proffered any evidence of the origin of the ice—or what substance formed the ice. Hanks offers only a hypothesis that it was likely caused by someone emptying a water bottle or other beverage container before heading into the airport; however, he does not foreclose the possibility that it could also have been naturally occurring.[2]

Hanks filed suit against the City of Boise, Republic Parking System, LLC, and United Components, Inc., alleging that his injuries were proximately caused by the Defendants' negligence. Hanks argued that the Defendants had a duty to maintain the passenger unloading areas of the airport in a safe condition and that the Defendants failed in that duty by not keeping the designated area free of ice. Early in the case, the district court dismissed the claims against United Components, Inc., with prejudice. Hanks does not contest this decision on appeal. The City of Boise and Republic Parking System, LLC, then moved for summary judgment and submitted declarations from two airport custodians, an airport parking employee, and the deputy director of operations and security at the airport in support of their position that they had met all legal duties owed to Hanks. The district court agreed and, accordingly, granted summary judgment. Hanks timely appealed.

## II. STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo and employs the same standard of review used by the trial court in ruling on the motion for summary judgment. *United Heritage Prop. & Cas. Co. v. Zech*, 170 Idaho 764, 770, 516 P.3d 1035, 1041 (2022) (quoting *AED, Inc. v. KDC Invest.*, *LLC*, 155 Idaho 159, 163, 307 P.3d 176, 180 (2013)). Accordingly, "[s]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Summerfield v. St. Luke's McCall, Ltd.*, 169 Idaho 221, 228, 494 P.3d 769, 776 (2021) (quoting I.R.C.P. 56(a)). "The moving party carries the burden of proving the absence of a genuine issue of material fact." *Banner Life Ins. Co.*

---

[2] Curiously, there is apparently no video footage in the record showing the location of the accident in the hours leading up to Hanks' fall.

*v. Mark Wallace Dixson Irrevocable Tr.*, 147 Idaho 117, 123, 206 P.3d 481, 487 (2009). "All disputed facts are to be construed liberally in favor of the nonmoving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the nonmoving party." *Foster v. Traul*, 145 Idaho 24, 28, 175 P.3d 186, 190 (2007).

### III. ANALYSIS

Hanks argues that the district court erred in granting summary judgment in three ways: First, Hanks claims that the district court erred in concluding that the icy patch was the result of an "isolated incident." Second, Hanks asserts that the court erred (a) in its determination that the City of Boise did not have constructive or actual knowledge of the specific condition, and (b) in failing to consider that the City of Boise's operating methods establish that the condition was dangerous and foreseeable. Finally, Hanks maintains that the district court improperly decided the issue of causation "sua sponte." We will address each argument in turn.

### A. The district court did not err in concluding that the icy patch was an isolated incident.

In Idaho, a common law negligence action has four elements: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Dupuis v. E. Idaho Health Servs., Inc.*, 168 Idaho 648, 653, 485 P.3d 144, 149 (2021) (citing *Brooks v. Wal-Mart Stores, Inc.*, 164 Idaho 22, 27, 423 P.3d 443, 448 (2018)). "When a negligence cause of action is based on premises liability, the element of duty depends on the status of the injured person in relation to the landowner, i.e., invitee, licensee (social guest), or trespasser." *Id.* (quoting *Brooks*, 164 at 28, 423 P.3d at 449). In this case, it is undisputed that Hanks was an invitee of the airport. Thus, this case hinges on the duty owed by a landowner to an invitee.

We have consistently held that to be liable to an invitee, a landowner must have either known or reasonably should have known of the dangerous condition. As we explained:

> The law is well settled in this state that, to hold an owner or possessor of land liable for injuries to an invitee caused by a dangerous condition existing on the land, it must be shown that the owner or occupier knew, or by the exercise of reasonable care should have known, of the existence of the dangerous condition.

*Shea v. Kevic Corp.*, 156 Idaho 540, 548, 328 P.3d 520, 528 (2014) (quoting *All v. Smith's Mgmt. Corp.,* 109 Idaho 479, 481, 708 P.2d 884, 886 (1985)).

While some dangerous conditions, such as a large pothole in a pedestrian walkway, will remain until remedied, others, such as ice, are transitory. Thus, we have differentiated "isolated incident" cases from those where there is a "recurring or continuous condition." As we have explained:

> For a nonrecurring or isolated incident, the invitee must show actual or constructive notice of the *specific condition*. For a recurring or continuing condition, the invitee must show "that the operating methods of the landowner or possessor are such that dangerous conditions are continuous or easily foreseeable."
>
> Even with a recurring or continuing condition, the invitee must show that the landowner had actual or constructive knowledge of the dangerous condition.

*Shea*, 156 Idaho at 548, 328 P.3d at 528 (emphasis added) (internal citations omitted). Thus, to succeed in his claim, Hanks must show either (1) that the Respondents knew or reasonably should have known of the *specific* ice patch alleged to have caused Hanks' injury, or, alternatively, (2) that the Respondents had actual or constructive knowledge of the *recurring* condition generally and that the Respondents' operating methods "are such that dangerous conditions are continuous or easily foreseeable."

To support his position, Hanks relies on our decision in *McDonald v. Safeway Stores, Inc.*, where we held that "the trial court could not have concluded *as a matter of law* that the presence of the ice cream on the floor was merely an isolated incident." 109 Idaho 305, 308, 707 P.2d 416, 419 (1985) (emphasis in original). Hanks urges a similar conclusion here, arguing that the district court erred in determining the presence of ice by the curb was an isolated incident.

In granting summary judgment to the Defendants, the district court relied on *Johnson v. Wal-Mart Stores, Inc.*, when it concluded that the ice Hanks slipped on was an "isolated incident." 164 Idaho 53, 59, 423 P.3d 1005, 1011 (2018). Specifically, the district court concluded:

> The facts in the case at hand are strikingly similar to those contemplated by the Idaho Supreme Court in *Johnson v. Wal-Mart Stores, Inc.*, 164 Idaho 53, 423 P[.]3d 1005 (2018). In that case, the [C]ourt similarly concluded that summary judgment was appropriate where liquid on a floor caused a slip and fall. The [C]ourt recognized the fact that defendant allowed customers to carry drinks in the store and that spills often occurred (even going so far as to note they were a big problem). Nonetheless, "an unidentified liquid on the ground for an unknown time in a less-frequently-traveled aisle where there is no obvious source of liquids-simply falls short of triggering a duty on Wal-Mart's part." 164 Idaho at 58.

The district court's reliance on *Johnson* was well-placed. In *Johnson*, this Court explained that in premises liability cases, there are generally two types of negligence: (1) cases based on a

6

recurring condition resulting from the property owner's practices, known as "operating method" cases and (2) cases not resulting from the property owner's practices, known as "isolated condition" cases. 164 Idaho at 57, 423 P.3 at 109. We compared Johnson's slip at Walmart with a similar incident in *Tommerup v. Albertson's, Inc.*, 101 Idaho 1, 607 P.2d 1055 (1980), *superseded on other grounds by statute*, I.C. § 6-801, in which a patron slipped on a pastry wrapper, and contrasted both with other cases where we found negligence based on the operating method. As we explained in *Johnson*:

> The instant case is more like the isolated condition in *Tommerup* than our "operating method" cases. While a pothole may form in almost any parking lot, children perhaps often drop wet or sticky items on the ground, and ice forms whenever water reaches too cold a temperature, those cases all had something more than the particular hazard on that particular day (knowledge that potholes saturated the parking lot, ice cream sitting long enough to melt after being handed out to children, instructions to de-ice a specific area with known ice buildup). As with *Tommerup*, the record here is "devoid of evidence indicating the condition which caused appellant's injury to have been other than an isolated incident." 101 Idaho at 4, 607 P.2d at 1058. No doubt spills occur in Wal-Mart, just as litter existed at the threshold of Albertson's in *Tommerup*. However, as the district court stated in its memorandum decision, "[t]he mere presence of a slick or slippery substance on a floor is a condition that may arise temporarily in any public place of business," and thus "something more is needed" to assign liability. *Carlyle v. Safeway Stores, Inc.*, 78 Wash.App. 272, 896 P.2d 750, 753 (1995).
>
> This Court agrees, and that "something more" is missing in this case. To hold otherwise would mean every store that deals in liquids and has a cleanup policy recognizing the dangerousness of spills would be liable for every spill anywhere in the store almost instantly. This is not the law in Idaho. Johnson has failed to provide more than a scintilla of evidence for his contention that Wal-Mart's allowance of liquids in its store, combined with the acknowledgement that spills are a potential danger to customers, generally imputes knowledge of a recurring or continuing dangerous condition.

*Johnson*, 164 Idaho at 58–59, 423 P.3d at 1010–11 (alteration in original). Just as the plaintiff in *Johnson* failed to provide more than a scintilla of evidence to justify imputing knowledge of a recurring or continuing dangerous condition, Hanks' claim fails for the same reason. Hanks offers only a hypothesis that an unknown third party emptied an unknown beverage by the curb, combines it with the scientific principle that a liquid can freeze when it gets cold enough, and then attempts to impute knowledge of a recurring or dangerous condition to the Respondents. However, Hanks' position is much more like that of the appellants in *Tommerup*, where we noted:

> Under appellants' proposal, liability could be imposed upon a defendant storeowner if a customer, shopping in its store, discarded a piece of litter in an aisle

7

upon which a second customer slipped and fell five seconds later. This despite no opportunity, reasonable or otherwise, for the defendant to prevent such an occurrence. We decline appellants' invitation to foster such an unreasonable result.

*Tommerup*, 101 Idaho at 4, 607 P.2d at 1058.

Hanks similarly seeks to impose liability upon a defendant airport whenever a passenger spills a beverage before a second passenger slips and falls. However, Hanks has only established that he slipped on ice in an area of the airport where he asserts that passengers sometimes empty beverages. There is no evidence of how long the icy patch existed before the accident or that the Respondents were aware of it. This is not sufficient to demonstrate a breach of duty under the facts of this case. Hanks' showing lacks the "something more" necessary to establish that the ice in question was "a recurring or continuing dangerous condition" and that it was related to an operating method of the Respondents.

Notably, in our decision in *McDonald v. Safeway Stores, Inc.*, 109 Idaho 305, 308, 707 P.2d 416, 419 (1985), we concluded that the something more was not just the presence of a slippery condition, but that the defendant's own business practice led to the slippery condition. The plaintiff in *McDonald* slipped on melted ice cream that had been accumulating all day from a demonstration. Thus, this Court concluded that Safeway's own business practice created the hazardous situation. *Id.* (citing *Jasko v. F.W. Woolworth Co.*, 494 P.2d 839 (Colo. 1972)).

Here, Hanks has failed to show "something more than [a] particular hazard on [a] particular day." *Johnson*, 164 Idaho at 58, 423 P.3d at 1010. As in *Johnson* and *Tommerup*, "the record here is 'devoid of evidence indicating the condition which caused appellant's injury to have been other than an isolated incident.'" *Id.* (citing *Tommerup*, 101 Idaho at 4, 607 P.2d at 1058). In other words, there is nothing establishing a known, recurring dangerous condition.

Just as there was "[n]o doubt spills occur in Wal-Mart," *id.*, there is no doubt spills sometimes occur in the gutter area next to the curb at the Boise Airport. *Johnson*, 164 Idaho at 58, 423 P.3d at 1010. However, Hanks not only failed to establish that passengers regularly pour out beverages in the area where he fell, he also failed to show that the airport's method of operation encouraged such a practice. While it is common knowledge for the modern traveler in the United States that TSA limits the volume of liquid that can be brought into the airport's secure area, there is nothing prohibiting passengers from carrying beverages into the airport itself or requiring

8

passengers to empty beverages at the curb.[3] Thus, " '[t]he mere presence of a slick or slippery substance on a floor is a condition that may arise temporarily in any public place of business,' and thus 'something more is needed' to assign liability." *Johnson*, 164 Idaho at 58, 423 P.3d at 1010 (quoting *Carlyle v. Safeway Stores, Inc.*, 896 P.2d 750, 753 (Wash. Ct. App. 1995)).

Taken together, we hold that the district court properly declined to treat this as an "operating method" case. The dissent disagrees and would instead conclude that Hanks has demonstrated a question of fact for jury consideration. The dissent characterizes the disputed fact as: "What would a reasonable landowner have done under these circumstances, knowing that travelers routinely empty the contents of their water bottles on the street outside the airport terminal building during freezing weather?" We respectfully challenge the dissent's premise, which presupposes that Hanks has demonstrated a genuine issue of material fact; namely, whether "travelers *routinely* empty contents of their water bottles on the streets outside the airport terminal building during freezing weather." (Emphasis added). The dissent overlooks that this Court has previously held that such generalized observations of particularized hazards are not sufficient to establish a recurring condition. As this Court made clear in *Johnson*:

> While a pothole may form in almost any parking lot, children perhaps often drop wet or sticky items on the ground, and *ice forms whenever water reaches too cold a temperature*, *those cases all had something more than the particular hazard* on that particular day (knowledge that potholes saturated the parking lot, ice cream sitting long enough to melt after being handed out to children, instructions to de-ice a specific area with known ice buildup).

*Johnson*, 164 Idaho at 58–59, 423 P.3d at 1010–11. For the dissent, the "something more" requirement is met by the knowledge of the "routine behavior of passengers" and "the City's *prior* policy." (Emphasis added). However, the something more must be "more than the particular hazard on that particular day." *Johnson*, 164 Idaho at 58-59, 423 P.3d at 1010-11.

The application of *Johnson* and *McDonald* to this case is quite simple: Hanks made no showing that the City had knowledge of a "known ice buildup" in the spot where he fell. Neither did he make any connection to an operating method which leads passengers to dump liquids in the area where he fell—in other words, there was no showing that the City's operating method created or knowingly permitted the unsafe condition. Absent such a showing, Hanks' claim must fail.

---

[3] In addition to failing to identify a policy prohibiting passengers from taking drinks into the airport, Hanks does not claim or argue that the City of Boise failed to have a designated dumping station where embarking passengers can empty any excess liquid before entering TSA screening.

9

Generalized truths, like the fact that water freezes or some passengers may dump their water bottles before entering an airport, cannot save Hanks' failure to proffer evidence creating a dispute whether the City knew that the area where Hanks fell was susceptible to ice buildup due to its operating procedures, or even, more simply, whether the location where Hanks fell was susceptible to ice buildup at all. While we construe the disputed facts in the light most favorable to Hanks, it is still Hanks' burden to present evidence creating a genuine factual dispute.

In the absence of proof in the record, the dissent appears to take judicial notice of "known passenger behaviors" without recognizing other common aspects of modern travel. For example, while we agree that it is well known that TSA prohibits passengers from taking certain liquids through a security checkpoint, missing from the record is evidence of *where* passengers dispose of their excess liquids. There is no evidence—aside from pure speculation—that passengers *routinely* dump liquids where Hanks fell and that such dumping creates known ice buildup in that location. The known passenger behaviors the dissent relies upon fail to include the fact that many passengers likely dump their liquids in a trash can, bathroom sink, water fountain, or, perhaps most conveniently, the dumping station located prior to entering the TSA security checkpoint. Of course, many passengers could also simply finish their beverage or bring an empty water bottle to the airport. The point is that, beyond mere speculation, Hanks failed to establish the practice of departing passengers at the Boise airport and any knowledge that it created a known risk.

While we acknowledge the dissent's concerns for the safety of travelers, we will not impose a duty on property owners to apply deicer any time the temperature drops below freezing, regardless of whether any precipitation has fallen. Such a course would depart from our jurisprudence which connects the operating method in practice to the recurring unsafe condition. Rather than apply this approach, the dissent looks to the change in City procedure and concludes that Hanks has put this issue into dispute by virtue of the City's *prior* procedure. However, our operating method cases are about knowledge: knowledge of a recurring condition resulting from a defendant's current operating method that puts a defendant on notice to such a degree that a court will impute knowledge of a specific condition to a defendant. Construing the facts in the light most favorable to Hanks, no such knowledge has been put into dispute in this case. If we were to follow the dissent's logic, in some parts of Idaho deicer would have to be applied virtually every day from October through April in anticipation that someone might spill a liquid on the ground. The fact that the City may have once had such a policy does not mean they could not change it, especially

10

where the record establishes that the policy in existence at the time of Hanks' accident required hourly inspections of the airport's roads for the presence of icy patches and application of deicer to any observed ice patch.

For these reasons, we conclude that the district court did not err in its determination that the icy patch was an isolated incident. Having concluded that the district court did not err in its conclusion that this was an isolated incident, Hanks must show that the Respondents had "actual or constructive notice of the *specific condition*." *Shea*, 156 Idaho at 548, 328 P.3d at 528 (emphasis added) (citing *All*, 109 Idaho at 481, 708 P.2d at 886); *see also McDonald,* 109 Idaho at 308, 707 P.2d at 419; *Tommerup*, 101 Idaho at 3, 607 P.2d at 1057.

B. **The district court did not err in its determination that the Respondents lacked constructive or actual knowledge of the condition that allegedly caused the slip.**

As mentioned above, Hanks alternatively argues that the Respondents had constructive or actual notice of the condition. Hanks suggests that the facts of this case are more akin to *Shea v. Kevic Corporation*, 156 Idaho 540, 328 P.3d 520 (2014), and *All v. Smith's Management. Corporation.*, 109 Idaho 479, 708 P.2d 884 (1985). For reasons similar to those discussed above, we conclude that the facts in both cases are distinguishable from those in this appeal, and the facts of this case are more akin to *Johnson.*

In *Shea*, the plaintiff brought an action against a car wash when she slipped and fell on a patch of ice near the exit of the car wash. While *Shea* is also a slip and fall on ice case, an important distinction is where the ice came from. In *Shea*, the plaintiff argued the ice originated from the car wash itself. The evidence established that every car that came out of the car wash was "dripping a little water." *Shea*, 156 Idaho at 549, 328 P.3d at 529. Thus, while *Shea* was an ice case, it is logically more like *McDonald* than the facts of this case. As we noted in *McDonald*, which concerned dripping ice cream provided by the defendant, the "something more" required for liability was the operating method. 109 Idaho at 308, 707 P.2d at 419. In *Shea*, the car wash created a continuously dangerous condition where water would be dripping on cars throughout their parking lot throughout the cold winter months. 156 Idaho at 549. 328 P.3d at 529.

Unlike *Shea*, the facts here are more like *Johnson*, where this Court determined there was not "something more." In *Shea,* the defendant played such a role in creating the continuously dangerous condition that notice of the dangerous condition could be imputed to the respective plaintiff. As in *Johnson*, something more is missing in this case. To hold otherwise would leave

11

all public, heavily trafficked buildings liable for every slippery or icy condition almost *instantly*. Consistent with *Johnson*, this is not the law in Idaho.

The other case cited by Hanks, *All,* 109 Idaho 479, 708 P.2d 884, is even less applicable. Importantly, the defendant in *All* had a parking lot plagued with potholes. *Id*. at 482, 708 P.2d at 887. Potholes by their very nature are different than ice in that potholes will remain as a hazard until filled, whereas ice will come and go. While *All* is less applicable than *Shea*, *All* does highlight what is missing in this case. In *All*, this Court determined that the defendant was aware of the general problem of potholes to a degree where the defendant was temporarily filling the potholes and planned to repave the whole parking lot. *Id.* There was "sufficient evidence to establish that the dangerous condition of the parking lot was a continuous and foreseeable consequence *of [the defendant's] operating methods*." *Id.* (Emphasis added). Considering this conclusion and the defendants' knowledge of the problem generally, we concluded that the plaintiff did not have to demonstrate knowledge of the *specific* pothole. *Id.* However, as discussed more fully above, Hanks has not only failed to provide sufficient evidence that the ice buildup routinely occurred, but he also failed to show that it was a continuous and foreseeable consequence of the defendants' operating method.

Importantly, the record demonstrates that this was not an area of the airport without safety precautions—in fact, the accident occurred in an area where regular inspections were conducted. While the Respondents did not deny that a spill can occur at this location, the Respondents also took a number of proactive measures to ensure the safety of the public. For example, as discussed by the district court in its memorandum decision and order:

> A Republic Parking employee, Chris Kelly, inspected the roadways at approximately 6:00 a.m. and again between 7:00 a.m. and 7:30 a.m. Per their policy, Kelly would have applied deicer anywhere he saw an icy patch. The City's custodial staff also inspected the sidewalk outside the terminal every hour. City employee Dan Bean inspected the upper deck shortly after 8:00 a.m. Mr. Bean would also have applied deicer to ice patches located on the sidewalks or in the roadway near the sidewalks.

In light of these safety precautions, the district court noted the lack of evidence upon which to infer that the icy patch which Hanks slipped on had been there for more than a brief period beforehand:

> The [c]ourt will not impute knowledge of the icy patch to Defendants simply because they know people may dump out liquids near the gutter-curb area. Passengers entering the airport are prohibited from carrying drinks past the security

12

gates. Defendants admit people dump out drinks prior to entering the airport and that, in the winter months, those dumped out liquids freeze very quickly—*wherever they are dumped out*. Defendants acknowledge they do not inspect underneath cars for buildup of ice because the passenger loading zone is extremely busy. Regardless, the sidewalks and roadways are inspected regularly and icy patches are treated when seen. Idaho law does not require continuous inspection to keep a premises safe for an invitee, only the exercise of ordinary care. *See Tommerup v. Albertson's, Inc.*, 101 Idaho 1, 5, 607 P.2d 1055, 1059 (1980). Here, there is no evidence from which to draw an inference that the icy patch on which Plaintiff slipped had been there for more than a brief period beforehand. Imputing knowledge of it to Defendants is unwarranted.

(Emphasis in original).

Taken together, we agree with the district court's conclusion that there is no evidence providing a genuine issue of material fact that the City of Boise had constructive or actual notice of the specific ice patch where Hanks slipped. Accordingly, we hold that the district court did not err in its determination that the City of Boise did not have constructive or actual knowledge and affirm the decision of the district court.

### C. The district court did not sua sponte decide the issue of causation.

In his brief on appeal, Hanks also argues that the district court erred when "it *sua sponte* decided the issue of causation despite the [Respondents] only moving for summary judgment on the element of breach." The Respondents argue that Hanks is mistaken and that the district court "was referring to the lack of evidence establishing the City's operations caused the dangerous condition that resulted in the injury." We agree and conclude that the district court did not sua sponte decide causation.

Importantly, the relevant excerpt from the district court's decision reads, in relevant part:

Finally, Plaintiff contends that the procedures in place for snow removal operations were inappropriate and that, had proper procedures been in place, it is likely further inspection of the area would have occurred prior to the incident. Whether or not that policy was appropriate is irrelevant to the present proceedings. *Assuming the snow removal policy was inappropriate or a breach of normal standard of care for snow removal, there is no evidence that the alleged breach caused the dangerous condition or Plaintiff's injury.* Accordingly, Plaintiff is unable to prove an essential element of his negligence claim.

(Emphasis added). In reaching this conclusion, the district court was not addressing causation as an element of negligence. Rather, as Respondents argue in their brief, this was merely a restatement of "what must be shown to support a premises liability claim under 'continuous condition' or 'operating method' line of cases." In other words, the district court was simply restating the

13

"something more" requirement: even if the snow removal policy was somehow insufficient, it would not impact the disposition because there was no evidence that a deficient roadway snow removal policy is what led to the dangerous condition.

In the operating method line of cases, knowledge of the dangerous condition is imputed to a landowner because the landowner's operating method created the dangerous condition—and that is what would make the landowner's failure to remedy the condition or warn about it negligent. Given the focus by the district court on the claim that the snow removal operations were inappropriate, it seems clear that the district court was stating what must be shown to support a premises liability claim under "continuous condition" or "operating method" line of cases. Accordingly, we conclude that the district court did not sua sponte decide the causation element of negligence.

## IV. CONCLUSION

For the reasons discussed above, we hold that the district court properly determined that there was no genuine dispute as to any material fact and that the Respondents were entitled to judgment as a matter of law. Even when viewed in a light most favorable to Hanks, the record supports the district court's conclusions that the icy patch was an isolated incident and the City of Boise did not have constructive or actual knowledge of the condition that precipitated the accident. Additionally, the record supports the district court's conclusion that the City of Boise's operating methods did not create a foreseeably dangerous condition. We also conclude that the district court did not sua sponte decide the negligence element of causation. Therefore, we affirm the district court's decision granting summary judgment to Respondents.

As the prevailing parties on appeal, we award costs to Respondents as a matter of course. I.A.R. 40(a).

Chief Justice BEVAN, Justices BRODY and ZAHN **CONCUR.**

STEGNER, J., dissenting.

I respectfully dissent. In my view, Paul Hanks has demonstrated a question of fact to be presented to a jury: What would a reasonable landowner have done under these circumstances, knowing that travelers routinely empty the contents of their water bottles on the street outside the airport terminal building during freezing weather? As explained by the majority, "this case hinges on the duty owed by a landowner to an invitee" and whether a landowner knew or should have

14

known of a dangerous condition. The majority concludes that the landowner has no such obligation under the circumstances presented in this case. Because I disagree with the majority's conclusion, I would reverse and remand this case because whether the City of Boise ("the City")[4] should have known this hazard existed is a question of fact for a jury to answer.

The majority concludes that the City's decision to *not* apply deicer in this instance was an "isolated condition[,]" rather than an "operating method" of the City. In isolated condition incidents, the landowner does not owe a duty of care to its invitees unless the plaintiff can demonstrate that there was "*something more* than the particular hazard on that particular day[.]" *Johnson v. Wal-Mart Stores, Inc.*, 164 Idaho 53, 58–59, 423 P.3d 1005, 1010–11 (2018) (italics added). This Court in *Johnson* noted that evidence of "something more" may include, for example, knowledge of a propensity for dangerous conditions to occur or, as in this case, a policy (albeit a former policy) to apply deicer to a specific area with known ice buildup. *Id.* at 58, 423 P.3d at 1010.

In this case, the majority reduces the duties of a landowner to nothing, suggesting that the cause of Hanks's injury was too speculative, as was the case in *Tommerup*: "Hanks offers only a hypothesis that an unknown third party emptied an unknown beverage by the curb, combines it with the scientific principle that a liquid can freeze when it gets cold enough, and then attempts to impute knowledge of a recurring or dangerous condition to the Respondents." The majority relies on *Tommerup v. Albertson's, Inc.*, 101 Idaho 1, 607 P.2d 1055 (1980), *superseded on other grounds by* I.C. § 6-801, as support for its analysis.

However, the majority's analysis does not withstand scrutiny. First, does anyone really question the likelihood that someone will empty liquids on a street, next to the curb, before entering an airport in Idaho, or anywhere else in America for that matter? Perhaps, in the days before the Transportation Security Administration ("TSA"), one would not expect a traveler to empty liquid in the street before entering a commercial airport, but now that TSA will not let travelers pass through its security checkpoints with more than three ounces of liquid, those days are over. Should the City have been aware of the likelihood of this happening? I think this question is for the jury, not a judge. What about the scientific principle that a liquid will freeze when it gets cold enough?

---

[4] Respondents in this case include the City of Boise and Republic Parking System, LLC. Before the district court, United Components, Inc., was also a named defendant; however, it is not participating in this appeal. The record indicates that the City owns and operates the Boise Airport and is, therefore, responsible for maintaining the roadways and sidewalks at the airport.

I think it is an accepted scientific fact that water not only can, but will, freeze at nineteen degrees Fahrenheit. Anything below thirty-two degrees Fahrenheit is, by definition, below freezing for water. This principle is so obvious it would not even require expert testimony to establish it. Finally, what is to be made of Hanks's attempt to "impute knowledge of a recurring or dangerous condition to [the City]." Prior to Hanks's fall, the City's policy was to apply deicer when the temperature dropped below thirty-four degrees Fahrenheit. This policy, in and of itself, is evidence of "knowledge of a recurring or dangerous condition" by the City. The City's prior policy would be admissible to show the City had knowledge of a recurring or dangerous condition. Why else would the City have a policy to apply deicer other than to prevent or abate a recurring, dangerous condition? Moreover, had the City's prior policy been in effect on the day of Hanks's accident, it is questionable whether Hanks would have fallen. Again, this is a decision for a jury and should not have been taken away from the jury.

I also think the majority's reliance on *Tommerup* is misplaced. In *Tommerup*, this Court refused to impose liability upon a landowner when the landowner would not have been able to prevent an injury. 101 Idaho at 4, 607 P.2d at 1058. There, we stated:

> Under appellants' proposal, liability could be imposed upon a defendant storeowner if a customer, shopping in its store, discarded a piece of litter in an aisle upon which a second customer slipped and fell five seconds later. This despite no opportunity, reasonable or otherwise, for the defendant to prevent such an occurrence. We decline appellants' invitation to foster such an unreasonable result.

*Tommerup*, 101 Idaho at 4, 607 P.2d at 1058.

*Tommerup* is distinguishable from this case for two reasons. First, *Tommerup* embodies a classic isolated condition case. The City's failure to apply deicer in this instance is more akin to a problematic operating method. As noted, prior to Hanks's fall, the City had a policy to apply deicer in the area where Hanks fell whenever the temperature dropped below thirty-four degrees. The temperature a few hours prior to Hanks's fall was nineteen degrees. If the City had not changed its policy, it is doubtful that ice would have formed, or that Hanks would have fallen. Second, *Tommerup* considered and appropriately rejected the notion of imposing liability almost instantaneously, such that the landowner would not have a chance to remedy the dangerous condition. However, in this case, the presence of ice would not have occurred instantaneously, and the City had an opportunity to remedy the dangerous condition—the City employed and contracted with workers who were responsible for cleaning up liquids outside the airport and applying deicer

16

to icy patches. In other words, the City *knew* there was a likelihood of a dangerous condition existing and changed its policy in a way that made it *more likely* that an injury like that sustained by Hanks would occur.

We know that people routinely empty water bottles in the street before they enter an airport, because they are prohibited from transporting more than three ounces of liquid through TSA checkpoints. We know that the City had a prior policy in place to apply deicer when the temperature reached thirty-four degrees or after one inch of snowfall had accumulated. We know that the temperature on the morning in question was below freezing. We know water does not freeze instantaneously, and the liquid that caused Hanks to fall would have had to have been present some time prior to his fall. Therefore, if the policy had not been changed, deicer would have been applied on the morning of Hanks's fall. It follows that an application of deicer presumably would have delayed, if not prevented, the freezing that caused Hanks's fall. At a minimum, the City's policy of attempting to remove dangerous icy conditions constitutes "something more" as was stated in *Johnson*. With the knowledge of the routine behavior of travelers and the City's former policy of applying deicer, there are genuine questions of material fact that preclude granting summary judgment. In sum, this knowledge and the City's prior policy of applying deicer is the "something more" that the majority fails to acknowledge.

Because summary judgment is only proper when there is no genuine issue of material fact, I would reverse the district court's grant of summary judgment and remand the case to allow the question of whether the City "should have known" it was breaching a duty it owed to Hanks to be resolved by a jury.